## Albert Appeal.

Argued September 30, 1952. Before STERN, STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Osmond K. Fraenkel,* of New York, with him *William Allen Rahill* and *Thomas D. McBride,* for appellant.

*Mortimer B. Lesher,* Solicitor, with him *Niles Anderson,* Assistant Solicitor and *Oscar G. Peterson,* for Board of Public Education of School District of Pittsburgh, appellee.

*Robert L. Kunzig,* Deputy Attorney General, with him *Robert E. Woodside,* Attorney General, for Commonwealth of Pennsylvania, intervenor, appellee.

*A. Harry Levitan* and *Witt and Cammer,* of New York, for Teachers Union, Local 555 and Local 556.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, November 25, 1952:

Miss Dorothy Albert, a professional employe of the School District of Pittsburgh, taught English at the Taylor-Allderdice High School; she had been a teacher for approximately eighteen years. Dr. Earl A. Dimmick, Superintendent of Schools of Pittsburgh, preferred charges against her, alleging that she was a Communist; he requested that her contract of employment be terminated for "advocation of or participating in un-American or subversive doctrines" in violation of section 1122 of the Public School Code of 1949, P. L. 30. The Board of Public Education held a formal hearing at which extensive testimony was taken; Miss

Albert was represented by counsel but she herself did not testify, nor did she present any testimony by other witnesses. As a result of the hearing the Board entered an order terminating her contract as a professional employe and discharging her as a teacher. She appealed to the Superintendent of Public Instruction, who, after hearing and argument, sustained the action of the Board. She then appealed to the Court of Common Pleas of Allegheny County but did not request in that court a hearing de novo to which she would have been entitled under section 1132(b) of the School Code had she demanded it. The court affirmed the action of the Superintendent and dismissed her appeal. From that order she now appeals to this court.

Section 1122 of the School Code enumerates the causes for the termination of a contract with a professional employe, and among them is listed "advocation of or participating in un-American or subversive doctrines". The Act of July 28, 1941, P. L. 530, had forbidden the employment in any capacity, by any agency of the Commonwealth or any county, city, borough, township or school district, of any person who thereafter should advocate or participate *"by an overt act or acts* in un-American or subversive doctrines"; any person so employed was to be dismissed in the same manner as provided by law for dismissals for other causes. The School Code omitted the words *"by an overt act or acts"*, thus apparently demanding a more rigorous standard of loyalty in respect to teachers than for other public employes. Appellant contended in the court below that the words "un-American or subversive doctrines" are vague and indefinite and that therefore this provision of the Code is unconstitutional and void. However, their connotation is no more uncertain than that of the other causes for termination of a contract with a professional employe enu-

merated in this same section of the Code, as, for example, "immorality", "incompetency", "cruelty", etc., for which causes dismissals of teachers have been frequently upheld by our courts. Exact definitions of such abstract terms are obviously quite impossible, but, as a practical matter, their application to specific situations does not involve any real difficulty. The Act of 1941, which was not repealed or impaired by the School Code, gave a general definition of the phrase as meaning "doctrines which teach or advocate the overthrow of the government of the United States or of the Commonwealth of Pennsylvania by revolution or the changing of the form of government of the United States or of the government of Pennsylvania by means not provided for in the Constitution of the United States or in the Constitution of the Commonwealth of Pennsylvania".[1] We conclude that there is no such ambiguity or obscurity in the terminology of section 1122 of the Code as would render it inoperative and incapable of judicial enforcement.

There is no question of the right of free speech involved in this case. Miss Albert is not being penalized in her capacity *as a private citizen* because of any political, economic or social views she may entertain or any expression she may care to give to those

---

[1] The Act of 1941 and section 1122 of the Public School Code of 1949 were both repealed by section 16 of the Pennsylvania Loyalty Act of December 22, 1951, P. L. 1726, which latter Act required that every person in the employ of the Commonwealth of Pennsylvania or of any of its political subdivisions, including teachers and other employes of the public school system, make a statement, under oath or affirmation, that he does not advocate, nor is knowingly a member of any organization that advocates, the overthrow of the government of the United States or of this Commonwealth by force or violence or other unconstitutional means; any person failing or refusing to execute such a statement shall be discharged immediately by the proper appointing authority.

views. The concern here is with her rights as a *teacher*, and the legislature can certainly prescribe qualifications for teachers in the public schools with respect not only to their academic attainments but also to their moral characters and their loyalty to the state and federal governments. Judge (later Mr. Justice) HOLMES, in a characteristically epigrammatic phrase, said in *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." To the same effect, Mr. Justice MINTON, speaking for the United States Supreme Court, said in *Adler v. Board of Education of the City of New York*, 342 U. S. 485, 492: "It is clear that such persons [employed or seeking employment in the public schools] have the right under our law to assemble, speak, think and believe as they will. . . . It is equally clear that they have no right to work for the State in the school system on their own terms. . . . If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere. Has the State thus deprived them of any right to free speech or assembly? We think not."

The Constitution of the Commonwealth, Article 10, Section 1, provides that "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools." Certainly our public school system is the most vital feature of our governmental and democratic system. In order to have such a "thorough and efficient system" those who teach in the public schools must be persons not only of learning and ability, of character and integrity, but they must be devoted to our country, its institutions and the basic principles upon which it was founded and hopefully will ever rest. Section 1511 of the School Code

provides that in every elementary public and private school there shall be taught "civics, including loyalty to the State and National Government." How can such loyalty be taught if the teacher herself be disloyal? As was said in *Thorp v. Board of Trustees of Schools for Industrial Education of Newark*, 6 N.J. 498, 514, 79 A. 2d 462, 470; "The school system affords the opportunity and means for subtle infiltration. . . . A teacher who is bereft of the essential quality of loyalty and devotion to his government and the fundamentals of our democratic society is lacking in a basic qualification for teaching." Children respect and look for guidance to their school teachers second only to their parents; their immature minds are influenced not only by what they are actually taught in the classroom but also by the personality of their teacher; the impressions they receive in school are bound to color their adult lives and to determine for them, as they advance into manhood and womanhood, whether they emerge as patriotic or as unfaithful citizens. In short, it is essential, in order to protect our children from treacherous influences, that persons who advocate or participate in subversive doctrines should not be employed, or if employed should not be retained, as teachers in our public schools, and any teacher dismissed for such a reason cannot properly claim that any constitutional or legal right is thereby violated.

According to the testimony before the Board of Public Education Miss Albert was, unquestionably, a member of the Communist Party. Her chief complaint, however, on this appeal, is that the Board not only took judicial notice of the fact that the Communist Party advocates the overthrow of the United States government by force and violence, but it refused to allow her to present testimony to the contrary. This court has definitely decided that judicial notice may

be taken of the fact that the Communist Party is a subversive organization which conspires to teach and to advocate the overthrow of the government of the United States by force and violence: *Milasinovich v. The Serbian Progressive Club, Inc.,* 369 Pa. 26, 29, 84 A. 2d 571, 573; *Commonwealth v. Truitt,* 369 Pa. 72, 81, 85 A. 2d 425, 429; *Matson v. Margiotti,* 371 Pa. 188, 193, 88 A. 2d 892, 895; *Pawell v. Unemployment Compensation Board of Review,* 146 Pa. Superior Ct. 147, 150, 151, 22 A. 2d 43, 45 (allocatur refused 146 Pa. Superior Ct. xxiii); (see also *Schneiderman v. United States,* 320 U. S. 118, 148, note 31). The doctrine of judicial notice is intended to avoid the necessity for the formal introduction of evidence in certain cases when there is no real need for it,—where a fact is so well established as to be a matter of common knowledge. That the Communist Party advocates the use of violence to overturn the governments of non-Communist countries, and especially that of the United States, has been proclaimed in legislative statutes,[2] and can fairly be said to be a matter of general notoriety. It would seem almost an absurdity of legal procedure to continue to submit to various juries in individual cases a question so readily and authoritatively determinable from the mere perusal of the writ-

---

[2] For example, in our own Commonwealth, the Act of December 21, 1951, P. L. 1712 proclaims that "Upon evidence which has been presented and proof which has already been established before the Congress of the United States, the federal courts of the United States, the courts of the Commonwealth of Pennsylvania, and the General Assembly of the Commonwealth of Pennsylvania, there exists an international revolutionary Communist conspiracy which is committed to the overthrow by force and violence of the government of the United States and of the several states, such conspiracy including the Communist Party of the United States, its local components in Pennsylvania, and the members thereof." See also the so-called "Feinberg Law", N.Y. Laws 1949, c. 360.

ings of the acknowledged founders and protagonists of the Communist movement—Marx, Engels, Lenin, Stalin and others[3]—which teach the doctrine of a proletarian revolution, the dictatorship of the proletariat, and the overthrow of the capitalistic system and "bourgeois democracy",—to be consummated by the forcible overthrow of the governmental organizations upon which alleged capitalist exploitation depends. Both general knowledge and accepted history stamp as indubitably true the statements contained in the opinion of Mr. Justice JACKSON in *American Communications Assn., C.I.O. v. Douds,* 339 U.S. 382, 425, 427, 429, 431, as follows: "The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate. . . . The Communist program only begins with seizure of government, which then becomes a means to impose upon society an organization on principles fundamentally opposed to those presupposed by our Constitution. It purposes forcibly to recast our whole social and political structure after the Muscovite model of police-state dictatorship. It rejects the entire religious and cultural heritage of Western civilization, as well as the American economic and political systems. . . . The Communist Party alone among American parties past or present is dominated and controlled by a foreign government. It is a satrap party which, to the threat of civil disorder, adds the threat of betrayal into alien hands. . . . *Violent and undemocratic means are the calculated and indispensable methods to attain the Communist Party's goal. It would be incredible naivete to expect the American branch of this movement to forego the only methods by which a Com-*

---

[3] "The Communist Manifesto" of Marx and Engels; "The State and Revolution" by Lenin; "The Theory and Foundation of Leninism" by Stalin.

*munist Party has anywhere come into power. . . . Every member of the Communist Party is an agent to execute the Communist program."* All the facts thus stated have long since become matters of such general notoriety that they are properly the subject of judicial notice. It is true, perhaps, that the presumption created by the doctrine of judicial notice is not a conclusive one but is subject to rebuttal. Wigmore (3d ed. vol. IX, p. 535, §2567(a)) asserts "That a matter is judicially noticed means merely that it is taken as true without the offering of evidence by the party who should ordinarily have done so. This is because the Court *assumes* that the matter is so notorious that it will not be disputed. But the *opponent is not prevented from disputing* the matter by evidence, if he believes it disputable." Appellant contends that she was deprived of due process of law because the Board of Public Education denied her the right to present evidence to disprove its assumption that the Communist Party advocates the overthrow of the government by force and violence. Be that as it may, appellant could have obtained·a hearing de novo in the Court of Common Pleas had she requested it and could there have asserted her right to present evidence designed to show that the Communist Party is not a subversive organization. Not having done so she is not now in a position to complain. Such a hearing would have cured any defects of the hearing before the Board and would have remedied the infringement, if any, of any constitutional or legal right of which she may have been deprived: *Commonwealth v. Cronin,* 336 Pa. 469, 474, 9 A. 2d 408, 411.

There remains for consideration the final contention of appellant that, even though she be a member of the Communist Party, and even if that Party does advocate the overthrow of the United States govern-

ment by force and violence, she should not be held to have advocated or participated in that subversive doctrine because guilt, being personal, is not to be adjudged merely on the basis of association since membership in a political party or other organization does not necessarily mean that one subscribes unqualifiedly to all its platform or asserted principles (see *Schneiderman v. United States*, 320 U. S. 118, 136); therefore there must be proof that appellant was aware of the Party's illegal designs,—that she had knowledge of its revolutionary purpose. Assuming this to be true, it is obvious that awareness, being a condition of the mind, can be proved to exist only by reasonable inference from objective facts and circumstances. There was sufficient testimony at the hearing before the Board of Public Education to convince any reasonable mind that Miss Albert *must* have been fully acquainted with the policies and purposes of the Communist Party to which she belonged. A witness, Matthew Cvetic, testified that he knew appellant for about four or five years, that he met her at meetings of the Communist Party which were attended by leading party functionaries, members of the executive committee of the Party, and members of the district committee. Some of these meetings were called for the purpose of "hammering out the 'Communist Party line' ", no persons being invited and allowed to enter unless they were members of the Communist Party. During the four or five year period the witness saw her at meetings of the Party or of one of the Communist-front organizations possibly 25 or 30 times. He testified that she participated in the discussions and voted on the reports of the district organizers; such reports were always approved by the members, all of them voting in favor of the Party line. He testified further that the Party had an educational program where books by Marx, Lenin and Stalin

were used, and he saw appellant with books by Marx and Engels in her hand; in one class a book used was "Theory and Practice of the Communist Party"; reading material included the Communist Manifesto and Lenin's "State and Revolution"; he testified that appellant was present at meetings where these books were discussed. There was placed in evidence at the hearing a sample membership card of the Party which set forth the rights and duties of Party members as follows: *"To attend club meetings, read the Party press and literature, pay dues regularly and be active on behalf of the program and policies of the Party.. To participate in working out all policies and tasks of the club and to regularly examine the execution of such policies. To strive to master the program and policies of the Party, the principles of Marxism-Leninism."* Having in mind that the Communist Party is a highly disciplined and rigidly controlled organization which tolerates no dissension from the policies laid down by its leadership; that appellant regularly attended and participated in meetings of high communist functionaries over a period of several years and was therefore not the merely casual member who joins an organization innocently and in ignorance of its policies and purposes and quickly resigns upon realizing its true import; having in mind further that appellant had been a school teacher for 18 years and was therefore presumably a woman of intelligence and education; that she chose to remain silent when she might have asserted her right to testify in the court below and present there evidence to refute the charges against her; and, finally, that the very secrecy, furtiveness and clandestine nature of the meetings[4] must have put her

---

[4] A witness, Dietze, testified at the hearing before the Board of Education that at the Communist meetings in his place, at some

on notice that the plans and policies were illegal;—having all those things in mind it would certainly strain the limits of credulity to believe that she did not know what she was doing and did not knowingly and consciously advocate and participate in the subversive doctrines of the Communist Party organization. To hold that in order to prove her personal complicity it would be necessary to produce affirmative evidence of what she actually saw, heard and discussed at any particular meeting of the Party would be to make utterly impossible the enforcement of the section of the School Code in question—in effect to nullify it—and thereby to permit the infiltration into the school system of disloyal teachers with free rein to exercise their baneful and sinister influence upon the children committed to their care.

The order of the court below dismissing the appeal of Dorothy Albert from the order of the Superintendent of Public Instruction is affirmed; appellant to pay the costs.

---

of which appellant was present, "the Comrades would knock on the wall, cut the linoleum," presumably to make certain there were no hidden dictographs or other revealing instruments.

It was said by Mr. Justice JACKSON in *American Communications Association, C.I.O., v. Douds*, 339 U.S. 382, 432; "The [Communist] Party is a secret conclave. Members are admitted only upon acceptance as reliable and after indoctrination in its policies, to which the member is fully committed. They are provided with cards or credentials, usually issued under false names so that the identification can only be made by officers of the Party who hold the code. Moreover, each pledges unconditional obedience to party authority. Adherents are known by secret or code names. They constitute 'cells' in the factory, the office, the political society, or the labor union. For any deviation from the party line they are purged and excluded."

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

The Pittsburgh Chapter of the Civil Rights Congress has filed a brief *amicus curiae* characterizing the proceedings against Dorothy Albert as a "witch hunt," a device to control thought and a means of suppressing a political party—all accomplished in a period of "hysteria and passion."

The term "witch hunt" in this connection represents loose thinking and irresponsible language because we know that witches have no existence except in a disordered imagination, and we know also that Communism is a reality with potential dangers to mankind that imagination cannot exaggerate.

Dorothy Albert was not charged with any supernatural offense. Her offense was a very earthy one. It was nothing less than advocating, through the Communist Party of which she is or was a member, the overthrowing of our government not by broomsticks but by bomb, bullet and bayonet, as exemplified by Communist history ever since Lenin in 1917 achieved his bloody revolution in Petrograd, Russia.

Dorothy Albert was afforded every opportunity to deny the charges made against her, but she preferred to remain mute. In the Court of Common Pleas of Allegheny County the witness stand was hers upon which to refute, deny, explain and amplify; the great power of subpoena was within arm's reach to summon witnesses in her behalf and to demonstrate that to her knowledge the Communist Party did not advocate violence, if that is her contention. How can she now argue, as she does through her attorney of the Civil Rights Congress that she has been denied due process of law? While a Court may not comment adversely on the refusal of a defendant to testify in a criminal trial, that prohibition does not attach in a civil procedure such as the one before us. Therefore, the appellant's silence,

in the face of the overwhelming proof brought against her, confirms the conclusions of the Pittsburgh School Board that she is a Communist and that she does adhere to the Communist Party's plotting and planning to overthrow the government of the United States by force and violence.

It is a paradox of the Communist mentality that when it is beyond the reach of a court's jurisdiction it will vociferously assert the right to freedom of speech, voicing doctrine and plan in vigorous and acrimonious opposition to our form of government, but when it stands before representatives of the law it prefers the silence of the tomb. Of course, there is an explanation for this seeming anomaly and the explanation is that in a court of law the witness's oath to tell the truth seriously shortens the range of a Communist's denunciation, for he knows that beyond a very clearly provable line of acceptable fact he steps into the territory of perjury where prosecution is not hampered as it is in the field of elastic interpretation of what constitutes freedom of speech.

The appellant, Dorothy Albert, was a teacher in the schools of Pittsburgh for eighteen years. She was no inexperienced illiterate, duped or deceived into accepting an ideology which, upon a later and mature reflection, she might wish to repudiate. She voluntarily joined an organization whose teachings must have quickly revealed to her a criminal purpose, she studied from books outlining a change of government through violence, she associated and conferred with individuals committed to that program of violence.

And then when, at last, the curtain of secrecy behind which she thought she was operating, was torn aside and she was discovered in the midst of equivocal circumstance, she was still not without a vehicle of exculpation, if she wished to employ it. The great

American institutions of freedom offered her every medium for explanation and exposition. The press, the radio, the television, the school board, the State Department of public instruction, the courts were hers to command in exposing any assumed injustice being done her. She was not lacking in competent legal counsel. Attorneys not only of the local forum but of distant fora hastened to her side to advise her and defend her. And the sum total of their counsel was that she should *not* avail herself of any medium to talk and explain away the accusatory circumstances.

In the country which formulated the ideology she has embraced, this opportunity to explain would not be forthcoming. A stone and iron cell, a summary adjudication based on a possible forced confession, and a flinging into the torture and oblivion of a slave camp, a distant Siberian exile, or worse, would be the fate of anyone disloyal to the dictatorship of the proletariat holding the people in a vise of absolutism never surpassed in the sorrowful history of man's domination over man.

The argument advanced by counsel for amicus curiae that the appellant is a victim of "thought control" is another illustration of the loose thinking and irresponsible language which go into the brief before us for consideration. Any Communist in the United States can mentally entertain plans for assassinating the president and his whole cabinet, destroying the capital and poisoning the water reservoirs of the nation, but unless those thoughts are expressed into words or deeds, government has no way of ascertaining them, much less punishing them.

Of course, we are aware that there was a time in the melancholy chronicle of man's struggle toward freedom when belief itself was subject to persecution, but the so-called ascertainment of that proscribed belief

was arbitrary and dogmatic. The inquisitioners simply assumed that their victim entertained certain thoughts and, because of that assumption, they subjected him to inhuman punishment. It was in that stage of history of man's inhumanity that there were solemn pronouncements also on witchcraft. But while there is much yet to correct in the twentieth century, it cannot truthfully be asserted that in America the national, state, municipal or school government compels any citizen into a mental strait-jacket.

It is asserted in the brief of amicus curiae that "every school board is left to steer for itself in an uncharted sea with no guide or compass." That sea is far from uncharted and no compass is lacking, either for the school board or for the school teacher. The Act of July 28, 1941, P. L. 530, Sec. 1, 65 P.S. Sec. 151, provides: "The phrase, 'un-American or subversive doctrines', shall be construed to mean doctrines which teach or advocate the overthrow of the government of the United States or of the Commonwealth of Pennsylvania by revolution or the changing of the form of government of the United States or of the government of Pennsylvania by means not provided for in the Constitution of the United States or the Constitution of the Commonwealth of Pennsylvania." This is the compass that Dorothy Albert tossed overboard, this is the lighthouse she ignored. She chose, instead, to accept the direct signalling from the Communist international station, and if this led her professional life to the rocks of disaster she has no one to blame but herself.

Before the appellant Dorothy Albert could be held accountable for entertaining un-American or subversive doctrines it was necessary that she advocate them, and there can be no advocacy through sealed lips, a penless hand or an immobilized body. But the appel-

lant did not restrict her subversiveness to "thought".
She attended Communist meetings, and, as indicated
in the excellent opinion of the Chief Justice, she took
part in discussions, participated in plans for adjust-
ing the American party·line to the Moscow party line,
voted on reports of Communist party district organizers
and thus objectively advanced the un-American and
subversive doctrines which her contract of employment
specifically prohibited her from advocating.

In every attempt made by the United States Gov-
ernment to curb the disloyal activities of the Commu-
nist Party, its attorneys have complained that this con-
stituted an infringement on the rights of a political
party. But the Communist Party is not a political
party. It is conceded that the primary objective of
Communism is the achievement of governmental power.
That power can be attained either by election or by
force. A careful and meticulous reading of Lenin's
"State and Revolution," the guidebook to Communist
power, will fail to disclose one passage or reference
to the attainment of power via the ballot box. One,
however, will have no difficulty in finding statements
such as the following:

"The bourgeois state can only be 'put an end to'
by a revolution."

"The replacement of the bourgeois by the proletarian
state is impossible without a violent revolution."

"The overthrow of the bourgeois rule can be accom-
plished only by the proletariat, as the particular class,
which, by the economic conditions of its existence, is
being prepared for this work, and is provided both with
the opportunity and the power to perform it."

The companion and guide to "State and Revolution"
and unquestionably the most important, popular and
formidable item in the armory of Communist litera-
ture, is the "Communist Manifesto", which proclaims:

*"The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions. Let the ruling classes tremble at a Communist revolution."*

The most succinct and authoritative utterance on this subject was made by United States Supreme Court Justice JACKSON in the case of *American Communications Assn., C.I.O. v. Douds,* 339 U.S. 382, 429: "In not one of the countries it now dominates was the Communist Party chosen by a free or contestable election; in not one can it be evicted by any election. The international police state has crept over Eastern Europe by deception, coercion, *coup d'etat,* terrorism and assassination. Not only has it overpowered its critics and opponents; it has usually liquidated them. The American Communist Party has copied the organizational structure and its leaders have been schooled in the same technique and by the same tutors."

The very written constitution of the Communist Party of the United States makes no assertion that it will seek power through duly constituted popular elections.

And if there are left any doubts about the violent intentions of the Communist Party in the United States, those doubts must melt before the revolutionary fire of William Z. Foster, national chairman of the Communist Party of the United States, who said:* "No communist, no matter how many votes he should secure in a national election, could, even if he would, become President of the present Government. When a communist heads a Government of the United States,

---

* This statement was originally made in 1928 and Foster has confirmed it several times since.

and that day will come just as surely as the sun rises, that Government will not be a capitalistic government but a Soviet Government and behind this Government will stand the Red Army to inforce the dictatorship of the proletariat."

In practically every prosecution of, or inquiry into the activities of Communists in the United States during the last decade or so, the cry has always been raised that the prosecution or inquiry was caused by the "hysteria" of the times. That approximately one-third of the land surface and one-fifth of the earth's population should be under the domination of a power intent on subjugating the entire world is something that is bound to wrinkle the nation's brow and bend the national back over the anvil in fashioning the weapon of collective defense. But this is far from saying that hysteria has captured the American people. Some of the Communist trials in the federal and state courts have lasted for many months and, with the appeals, have consumed years of time. The basic legislation under which the appellant was made to answer was placed on our statute books in 1941. She thus was aware of its existence for nine years before she was called to account. Nor was there any precipitate disposition of her case after she was first notified of her violation of the school law.

On March 14, 1950, Dorothy Albert was publicly named as a Communist by Matthew Cvetic, an undercover agent of the Federal Bureau of Investigation. On March 28, 1950, the Board of Public Education adopted a resolution terminating her contract of employment. A formal hearing was held on April 12, 1950, and from the adverse results of that hearing, she appealed to the Superintendent of Public Instruction, who granted a hearing on January 18, 1951. When the Superintendent confirmed the dismissal, Miss Albert appealed

to the Court of Common Pleas which offered her a hearing *de novo*. On September 24, 1951, the Court of Common Pleas affirmed the decision of the Superintendent of Public Instruction and she has now appealed to this Court. Thus two years and eight months have passed since Miss Albert was informed of the charges against her. Instead of moving over a swift river of hysteria and passion, as appellant's counsel would have one believe, Miss Albert's case has proceeded through a canal with immeasurable dikes, dams and locks within each set of which she has had unlimited opportunity to present her case and within which the tribunal involved has been methodic, painstaking and deliberate in reaching its conclusions.

As appellant's counsel has sought out a medieval age for some of his phraseology in criticism of this case, so has he also in his arguments of the law drawn from decisions which, in the present state of juridical development on the subject, must be regarded archaic. Counsel depends much on the famous Schneiderman case (*Schneiderman v. United States*, 320 U. S. 118.) But that case is no longer law. It was quite definitely overruled by *Dennis v. United States*, 341 U.S. 494, and *C.I.O. v. Douds*, 339 U.S. 382.

In my opinion the *Schneiderman* case was never good law. The majority opinion there declared: "A tenable conclusion from the foregoing is that the Party in 1927 desired to achieve its purpose by peaceful and democratic means, and as a theoretical matter justified the use of force and violence only as a method of preventing an attempted forcible counter-overthrow once the Party had obtained control in a peaceful manner, or as a method of last resort to enforce the majority will if at some indefinite future time because of peculiar circumstances constitutional or peaceful channels were no longer open."

34

This, in spite of the "Communist Manifesto" and "State and Revolution," from which we have already given quotations, and other Communist manuals such as "The Statutes, Theses and Conditions of Admission to the Communist International," and "The Theory and Practise of Leninism," written by Stalin, all of which spell out revolution as clearly as red flags flying over street barricades which are aiming cannon at the capitol dome.

The majority opinion in the *Schneiderman* case was written by Justice MURPHY and concurred in by Justices DOUGLAS, RUTLEDGE and BLACK. Justice JACKSON did not participate in the decision because the Department of Justice, under his administration as Attorney General, had conducted some of the proceedings against Schneiderman.

What Justice MURPHY said in the statement above quoted is that the Communists would *enforce* the majority will when, because of peculiar circumstances, constitutional or peaceful channels were no longer open. How would they determine the "majority will"? We know that in every country where Communists have seized power they have stated that they were enforcing the will of the people, and they said further that constitutional and peaceful channels were not open. That is what they said when they seized Albania, Bulgaria, Poland, Czecho-Slovakia, Hungary, Rumania, China and so on. That was their cry when they invaded South Korea.

The theory which the Communists advance, and which the *Schneiderman* case gave a color of tenability to, is that they do not advocate violence in itself. It is the "capitalists" who cause trouble by refusing to give up the property which belongs to the proletariat. In other words, it is not the robber who precipitates violence. It is the victim who declines to surrender his

valuables and consequently invites the physical abuse which the robber is compelled to visit upon him because of his unreasoning resistance!*

Even if the Communists were to acquire power through non-violent methods, it is admitted that their first move would be to change our form of government from a representative republic to a dictatorship of the proletariat, and that transformation, of course, could only be one of violence. Our constitution specifically guarantees to every State a republican form of government. Joseph Stalin in his book, "Foundations of Leninism," specifically declares that dictatorship of the proletariat does not consist in a "mere change of personalities in the government," but "a revolutionary power based on the use of force against the bourgeoisie." He also explains that this involves "the smashing of the bourgeois state machine, the bourgeois army, the bourgeois bureaucratic machine, the bourgeois police."

The utter untenability of Justice MURPHY's "tenable conclusion" becomes appalling when one reflects that smashing the state machine is certainly not the constitutional manner in which to amend our constitution.

In *Kjar v. Doak*, 61 F. 2d 566, the Communist there involved insisted that his party intended to acquire

---

*In arguing before the Jury in the New York Communist case, Eugene Dennis, secretary general of the Communist Party pointed to the American Civil War in illustration of his point. He said that the United States had assumed power through revolution and the Civil War was the counter-revolution which the Government had the right to smash. Thus, in presently taking over the government the proletariat would only, in effect, be smashing the counter-revolution which the American bourgeoisie would be waging by attempting to hold on to the government, thus thwarting the "majority will"!

power by argument and persuasion and then, if the owners of capital would refuse to be peaceably dispossessed of their property, force and violence would be utilized in order to accomplish the party's ends. Meeting that argument the United States Circuit Court of Appeals said: "If it be conceded that appellant is right in this contention, that fact would not relieve him from the operation of the statute, which is not based alone on initial violence. Possession of our government is accomplished many times by a mere majority—and oftentimes by a minority—of its citizens; yet in such event it could not be claimed that the political party in possession would have the right to strike down the basic form of our government as prescribed by our Constitution, and by force or otherwise dispossess owners of their property. Our Federal Constitution, and those of the several states, can be modified or abrogated only by the method therein provided, and that right is not dependent upon possession of mere governmental agencies."

The minority opinion in the *Schneiderman* case was written by the Chief Justice of the United States Supreme Court, Chief Justice STONE, who, dealing in realities, and not academics, said.: "The evidence shows and it is not denied that the Communist Party organization at the time in question was a revolutionary party having as its ultimate aim generally, and particularly in England and the United States, the overthrow of capitalistic government, and the substitution for it of the dictatorship of the proletariat."

Further: ". . . it is not questioned that the ultimate aim of the Communist Party in 1927 and the years preceding was the triumph of the dictatorship of the proletariat and the consequent overthrow of capitalistic or bourgeois government and society."

Chief Justice STONE quoted from the book, "The Statutes, Theses and Conditions of Admission to the Communist International", which Justice MURPHY found innocuous: ". . .'The class struggle in almost every country of Europe and America is entering the phase of civil war. Under such conditions the Communists can have no confidence in bourgeois laws. They should create everywhere a parallel illegal apparatus, which at the decisive moment should do its duty by the party, and in every way possible assist the revolution.' "

This Communist manual urged that in addition to " 'systematic unlawful work,' 'it is especially necessary to carry on unlawful work in the army, navy, and police.' "

Further: "From the beginning, and during all times relevant to this inquiry, there is evidence that the Communist Party organizations advocated the overthrow of capitalistic governments by revolution to be accomplished, if need be, by force of arms."

Answering the proposition that Communists only intended to use violence when capitalists refuse to give up their property, Chief Justice STONE said: "We need not stop to consider the much discussed question whether this meant more than that force was to be used if established governments should be so misguided as to refuse to make themselves over into proletarian dictatorships by amendment of their governmental structures, or should have the effrontery to defend themselves from lawless or subversive attacks. *For in any case the end contemplated was the overthrow of government, and the measures advocated were force and violence.*" (Italics supplied)

Justice MURPHY saw nothing dangerous in the teachings of Marx and Engels, the architects of the Commu-

nist Manifesto. Chief Justice STONE said in reply: "And in order that there might be no misunderstanding of the term 'revolution,' Engels' definition of revolution was revived and restated as follows: 'Revolution is an act in which part of the population forces its will on the other parts by means of rifles, bayonets, cannon, i.e., by most authoritative means. And the conquering party is inevitably forced to maintain its supremacy by means of that fear which its arms inspire in the reactionaries.'"

The Chief Justice quoted further from the Communist literature in the case which the four-justice majority passed over as innocuous: "'That which before the victory of the proletariat seems but a theoretical difference of opinion on the question of "democracy," becomes inevitably on the morrow of the victory, a question which can only be decided by force of arms.' 'The working class cannot achieve victory over the bourgeois by means of the general strike alone, and by the policy of folded arms. The proletariat must resort to an armed uprising.' 'To say that the revolution can be achieved without civil war is to say that a "peaceful" revolution is possible. . . . Marx was a believer in civil war—that is, the armed struggle of the proletariat against the bourgeois. . . . The teachers of Socialism took the revolution very seriously. It was clear to them that the proletariat could not convert the bourgeoisie, and that the workers would have to impose their will upon their enemies through a war carried on by guns and bayonets.'"

"The aims of the Communists could be achieved only by 'the annihilation of the entire bourgeois governmental apparatus, parliamentary, judicial, military, bureaucratic, administrative, municipal,' and it was necessary for the Communists 'to break and destroy' the 'apparatus.' The annihilation of the existing po-

litical structure was deemed as necessary in the United States as elsewhere."

In concluding his opinion, in which he was joined by Justice ROBERTS and Justice FRANKFURTER, Chief Justice STONE said: "It would be little short of preposterous to assert that vigorous aid knowingly given by a pledged Party member in disseminating the Party teachings, to which reference has been made, is compatible with attachment to the principles of the Constitution." [of the United States.]

And, thus, in the case before us it would be little short of preposterous to assert that the aid given by Dorothy Albert to disseminating the teachings of the Communist Party would be compatible with loyalty to the United States Constitution and the school code of the Commonwealth of Pennsylvania.

In pressing the *Schneiderman* case, counsel for the appellant argues that there can be no guilt by association. It would indeed be unfair and unjust to declare that because a Mr. B happened to be walking along the street when a white-sheeted procession went by that he is guilty of Ku Klux Klanism. But if Mr. B steps along in the procession itself, wearing a hood and robe, and later is observed firing a cross on a hill, it would not be unfair to assume that he was approving of the policies of the Ku Klux Klan, and it would not be too much to expect that he should explain how he happened to be involved in activities in which innocent people do not ordinarily participate. It might be fantastic to visualize, but in the realm of sheer possibility it would be possible for Mr. B to be free from guilt on the basis that he thought the hooded procession was a circus affair, that he wore the KKK paraphernalia in the spirit of Halloween fun, and that when he arrived at the hill he thought a Fourth of July celebration was in progress and believed the cross to be a

giant pin wheel which he lit because someone handed him a match. If such a hypothesis coincided with facts, would it be expecting too much that Mr. B should state it? How else could one believe such a farrago of improbabilities? And with what logic could Mr. B, in the face of such evidence, sit back with an air of aggrieved innocence and complain that it was only hysteria which was charging him with Ku Klux Klanism?

Dorothy Albert was not dismissed from her teacher's position on the basis of guilt by association but guilt by participation. She cannot sit back, as in the hypothetical KKK case, and assume the attitude that she has been grossly misunderstood when she refuses to explain the culpable circumstances which envelop her so overwhelmingly.

Why should the appellant not answer the charge of disloyalty? Why should anyone who receives pay from the pockets of American taxpayers not be required to state whether he or she is loyal to the United States and has a due regard for the security of those who are his or her employers?

The American people today are carrying the heaviest tax burden in history. These crushing levies are due to the staggering sums required to maintain a military establishment that would never have been necessary were it not for the Communist threat against the very life of the nation. American boys are being taken from school to be made into soldiers and to prepare for all the hazards which a soldier confronts. Peacetime conscription, so contrary to American traditions, has become an absolute and almost permanent necessity— all because of Communism. And yet, it is argued before us that government authorities must not ask a person who deals with Communists, lives with Commu-

nists, and boasts of Communism, whether he or she is a Communist.

The United States Congress, the Supreme Court of the United States and the appellate courts of Pennsylvania have declared that the Communist Party is committed to the overthrow of the government of the United States and that of Pennsylvania by force and violence. Every Communist, therefore, must be presumed to carry with him tools which can be used in gaining the ultimate objective of the Communist Party. Whether he will actually use these implements or whether he has repudiated the scope and purpose of his Party is something that he knows better than anyone else. Is it not incredible, then, that he should demand immunity from questioning as to what he intends to do with these tools which aim at destruction and not construction?

The resources of America are being strained and its treasures can face exhaustion in order to fight the world-wide menace of sovietized revolution. Would it not be absurd to spend billions of dollars to keep Communists out of Europe, if they were to be allowed to operate untrammeledly in the schoolhouses on this continent? Would it not be the height of tragic folly to expend American blood to keep Communists out of South Korea and then allow them to ply their nefarious trade in American cities, factories and public places of every description?

The conflict with Communism and Communists is the most vital and decisive wager of battle which has ever engaged the brain and heart of America. No war has threatened the homes, the future, the very survival of the American people like this one. The population of America continues with its daily tasks, always striving to elevate even higher the standard of living which has no equal in the world. The symphony of in-

dustry, trade and commerce sweeps across the land, the perfume of achievements in the arts, literature and culture is in the air, laughter and song lift from the happy hearts of a nation that wants peace, but at any moment an atomic bomb can be dropped on Philadelphia, Harrisburg or Pittsburgh;—and Hiroshima, with Nagasaki, will sigh in its commiserating ashes.

That bomb can be averted and the plane which would carry it here can be stopped in flight if the fifth column in America is eliminated. In all their madness, the rulers of Russia would never direct an atomic bomber to America without having accomplices here to preadvise on strategic targets and strategic courses and without their having confederates here to refuel the plane's engines and care for its crew, if necessary.

But Soviet martial and criminally imperialistic expansion would cease at once if no fellow-conspirators were waiting in the country to be invaded—prepared to open the gates to the invaders.

Relevations during the last ten years on infiltration of Communists into the American scheme of life have been nothing short of appalling. Congressional investigations, court trials and voluntary confessions have disclosed that Communists have stolen state secrets and the awesome bomb secret; they have penetrated into the Department of State and other departments of the United States Government; they have entered into the Armed Forces; they have taken over, labor unions employing workmen engaged in building submarines, radars, electric machinery and other equipment vital to the nation's defense; they have precipitated strikes to cripple defense programs; they have polluted the literary, artistic, radio and cinematic streams; they have published periodicals which twisted and distorted data and news to favor Soviet propagandistic purposes. May they now be allowed to poison

the springs of learning at which the children of America drink? And then is it to follow that they may not even be questioned as to their fidelity or lack of it to the government of a nation which offers them freedoms not surpassed in the whole world?

There have been more inquiries—federal, state and otherwise—more cases decided, and more books written on Communism than any other phase of American history having to do with defense of our fundamental liberties, with the possible exception of the slavery question prior to the Civil War. All this investigation, research and litigation has resulted in one undeviating finding, namely, that Communism consists of an ideology inimical to the American way of life and is committed to a violent overthrow of the government which protects the American way of life.

Is it to be supposed that everyone is familiar with this but the school authorities of Pennsylvania? They perhaps more than anyone else know what are the dread potentialities of unabated Communism. Nearly every day newspapers carry stories on the traitorous acts of Communists of America. These stories very frequently go into news columns paralleling the casualty lists from Korea where Americans are being shot down by Communist bullets. Is a school district, aware of the intentions of Communists to betray America to Russia whenever possible, to allow a benighted teacher, consciously or unconsciously, to introduce her ideological darkness into a schoolroom?

The Communist Party is one. It is international. It is global. If Dorothy Albert is a Communist, she is an international Communist, and the plans of the international Communist Party are to create dissension, disunion, strife and civil war all over the world. They are trained to sabotage every orderly procedure

44

in every country which has not yet been drawn behind the "Iron Curtain."

Every Communist is a potential Russian spy. The House Un-American Activities Committee reported (Union Calendar No. 1134, House Report No. 3249, Jan. 2, 1951) : "The attack upon Korea makes it plain beyond all doubt that communism has passed beyond the use of subversion to conquer the independent nations and will now use armed invasion and war. With the Armed Forces of the United States actually pitted in conflict against the legions of international communism, the Communist Party of the United States can no longer be viewed passively as a group of mere political and ideological dissidents, but must be looked upon with all seriousness as a military fifth column actively aiding our enemies."

Communists in America seek to turn this country into a Russian Soviet colony, not because they believe the Communist State is a superior form of government, but because they hope and anticipate that with the coming of a proletarian dictatorship they will share in the Lucullean feast of absolutism. A grave responsibility rests on American officialdom to avert that banquet by withholding from the expectant diners the food of opportunity to betray.

Government department heads, school officials, labor leaders, professional societies, publishing houses, radio and television supervisors—all have the solemn duty of vigilance to destroy the Trojan horse before it opens its treacherous flanks.

Counsel for amicus curiae, who, like the Communist leader Vishinsky, has already demonstrated himself not to be lacking in strength to twist cast iron fact into pretzelled fiction, states in his brief: "Despite overwhelming proof of the commission by the Nazis of the most monstrous crimes in recorded history, the Inter-

national Tribunal in Nuremberg refused to impose guilt upon the individual merely upon a showing of membership in a Nazi organization."

I happened to have the honor of being a member of the International War Crimes Tribunal in Nuremberg and so have personal knowledge of the decisions promulgated there. That appellant's counsel is in error with regard to the statement just quoted is of little consequence because he has proved himself in error so much, but in the interests of truth let it be recorded that Article 10 of the Charter of International Military Tribunal provided, inter alia: "In cases where a group or organization is declared criminal by the Tribunal, the competent national authority of any Signatory shall have the right to bring individuals to trial for membership therein before national, military or occupation courts."

In accordance with the mandate in this Article, the International Military Tribunal, after hearing evidence on the subject, declared that the activities of the Leadership Corps of the Nazi Party, the Gestapo and SD, and the SS were so notoriously illegal, inhuman and cruel and those activities were so well known, that all those belonging to those organizations were declared prima facie aware of the criminalities thereof.

In view of this documented fact, one sees how devoid of fairness and how abysmally disrespectful of American honor is the statement of counsel when he mordantly declares: "If American, not Nazi justice is extended to Nazis, it is doubly ironic to extend Nazi, not American, justice to Americans."

Inspired and influenced as was Dorothy Albert by atheistic, communistic ideology, no one can evaluate the harm she visited upon the brain, heart and soul of the children who passed through her classes during the eighteen years she was a teacher in the Pittsburgh

schools. However, despite her disloyalty to the United States and her flagrant remissness of duty owed the children and their parents, she has in no way been impeded as a citizen or a litigant. Every opportunity was afforded her to present her case, every avenue of appeal was facilitated for her, and the way is still open to her to renounce the sinister doctrine which experience must now prove to her, can only rust the brain, corrode the heart and fasten ugly fetters on the spirit of freedom.

Despite the appellant's proved betrayal of the trust placed in her as a school teacher and as a citizen of the United States, she is still a free citizen and is not hampered in her enjoyment of American bounty. No one expects gratitude for this American generosity because it is simply the American way. But to have this American big-heartedness, kindness and tolerance branded as "Nazi justice," is indeed adding grievous insult to boundless injury.

However, this miserable characterization by counsel in the case is but a drop in the ocean of calumny which international Communist calumniators have splashed over this great nation. But the United States still replies with logic and forbearance because only in the tribunal of unlimited patience and never-ceasing advocacy of reason can we expect the final adjudication which will produce the permanent peace for which mankind has yearned through the ages.

And, despite all black signs to the contrary, I believe that with continued good will between nations dedicated to truth and honor, world tranquility can yet come within humanity's grasp.