76 So.2d 798 (1954)
STATE ex rel. Phil FELDMAN, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Max SHLAFROCK, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Charles MARKS, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. David LIPPERT, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Charles SMOLIKOFF a/K/a Charles Small, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Walter MARKS, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Augusta BIRNBERG, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Emanuel GRAFF, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Maurice CARROLL, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Abraham SORKIN, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. H.D. PRENSKY, DDS, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Michael SHANTZEK, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Morris ROHINSKY, Petitioner,
v.
Thomas J. KELLY, Respondent.
STATE ex rel. Jose CARBONELL, Petitioner,
v.
Thomas J. KELLY, Respondent.
Supreme Court of Florida, en Banc.
November 19, 1954.
*799 L.J. Cushman, Miami, for Phil Feldman and H.D. Prensky, DDS, petitioners.
Tobias Simon, Miami Beach, for Morris Rohinsky, petitioner and appellant.
Howard W. Dixon, Miami, for Jose Carbonell and Max Shlafrock, petitioners and appellants.
Louis Glick, Miami, and John M. Coe, Pensacola, for Michael Shantzek, David W. Lippert and Charles N. Smolikoff, a/k/a Charles Small, petitioners and appellants.
*800 Erstling, Zuckerman & Ehrich, Miami, for Walter Marks, petitioner.
Milton R. Wasman, Miami, for Emanuel Graff, petitioner.
Louis Glick, Miami, and T.T. Turnbull, Tallahassee, for Augusta Birnberg and Maurice Carroll, petitioners.
George Kastenbaum, Miami Beach, for Abraham Sorkin, petitioner.
Eli Breger, Miami Beach, for Walter Marks, petitioner.
George A. Brautigam, State's Atty., Miami, Richard W. Ervin, Atty. Gen., and Reeves Bowen, Asst. Atty. Gen., for respondent and appellee.
PER CURIAM.
These cases involve appeals from orders in habeas corpus proceedings originating in the circuit court of Dade County or orders on petitions for habeas corpus filed in this Court wherein petitioners were adjudged in contempt and committed to jail for refusing to answer questions before the grand jury with reference to any knowledge they might have about communist activities prior to a period of two years and one day next preceding the date of interrogation. Each defendant refused to answer on the ground that his answer might incriminate him. All petitioners invoked the protection of the Fifth Amendment to the Federal Constitution and Section 12, Declaration of Rights, Constitution of Florida, F.S.A.
The 14 petitioners and appellants will hereinafter be referred to as petitioners, and appellee or respondent, Sheriff of Dade County, will hereinafter be referred to as respondent. The petitioners are regularly before this Court. By agreement of the parties, the cases were combined and argued together. It was also admitted that the questions propounded in each case were common and could be answered in one opinion. The questions propounded to petitioners in the investigation before the grand jury varied slightly in content but all fell under one of the following categories:
(1) Questions concerning the witness' contacts with or association with the Communist Party or organizations affiliated with the Communist Party.
(2) Questions concerning the witness' acquaintance with or association with various named persons allegedly members of the Communist Party or organizations affiliated with the Communist Party.
(3) Questions concerning meetings attended by the witness at which various named persons allegedly members of the Communist Party or of organizations affiliated with the Communist Party were present.
Petitioners have propounded one question, and respondent has propounded six questions for us to consider but none of them comply with Kneale v. Kneale, Fla., 67 So.2d 233, wherein we attempted to define a clear and concise rule for stating questions on appeal. Compliance with this rule would pinpoint the issues and would extract all the "blow gum" from the questions we are called on to adjudicate.
The real point for determination is whether or not one being investigated for communist activities may refuse to answer questions falling under one or all the categories above enumerated because he fears his answers would incriminate him, even though they revealed no more than one link in the chain of evidence against him. The Fifth Amendment to the Federal Constitution and Section 12, Declaration of Rights, Constitution of Florida, are relied on to shield them from answering.
Respondent contends that this question should be answered in the negative and supports that contention with the premise (1) it is not a crime to be a member of the Community Party, (2) petitioners are not charged with criminal communism, and (3) being interrogated in a state court they were not entitled to claim the protection of the Fifth Amendment to the Federal Constitution.
*801 It is necessary that we refer to and consider F.S. §§ 876.01, 876.02(4, 5) and 876.03, F.S.A., in order to determine whether or not membership in the Communist Party is a crime in this state. These sections have reference to criminal communism and it is a crime and a felony, punishable by imprisonment for not more than 10 years or a fine of not more than $10,000, or both, to be a member of a criminal communist organization as defined and referred to in the above mentioned provisions of the law. As to whether or not there was an effort to connect petitioners with criminal communism, the record and the questions propounded them show that the investigation before the Grand Jury was about communist activities under the statute, including communist activities in Dade County. In our view said questions were ample to contemplate criminal communism. See State ex rel. Benemovsky v. Sullivan, Fla., 37 So.2d 907.
While the petitioners contend that they are entitled to claim the protection of the Fifth Amendment to the Federal Constitution, the courts have many times held that the Fifth Amendment applies only to Federal Courts and is not a limitation on the power of the states. The point is so well settled that citation of supporting authority is unnecessary. However, it should not be overlooked that Section 12, Declaration of Rights, Constitution of Florida, is a rescript of the Fifth Amendment, Federal Constitution; and the test in all such cases should be whether or not the answer to the question or questions would create a reasonable fear that criminal charges would be filed against petitioners. Under the early decisions the person questioned might determine this, but under later adjudications it is a question of law for the court to determine, governed by the setting in which he finds it. Brunner v. United States, 9 Cir., 190 F.2d 167; State ex rel. Mitchell v. Kelly, Fla., 71 So.2d 887; United States v. Weisman, 2 Cir., 111 F.2d 260.
The decisive cases on the point are Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170, and Brunner v. United States, 9 Cir., 190 F.2d 167, reversed in 343 U.S. 918, 72 S.Ct. 674, 96 L.Ed. 1332, on authority of Blau v. United States. The Blau case had to do with a prosecution under the Smith Act, effective June 28, 1940, 18 U.S.C.A. § 2385. Chapter 20216, Laws of Florida, now Sections 876.01-876.04, F.S.A., under which the present investigation was instituted, was passed in 1941. In legal effect the latter Florida Act is a rescript of the Smith Act, both having been designed for the same purpose. The Florida Act having been patterned on the Smith Act, we have elected to accept the interpretations of the Smith Act by the Federal Courts. Duval v. Hunt, 34 Fla. 85, 15 So. 876; State ex rel. Porter v. Atkinson, 108 Fla. 325, 146 So. 581; Kidd v. City of Jacksonville, 97 Fla. 297, 120 So. 556; Gay v. Inter-County Tel. & Tel. Co., Fla., 60 So.2d 22. Under the rule prescribed in these cases, interpretation of the Florida act should follow the interpretation of the Smith Act by the Federal Courts; hence we say the Blau case concludes the point.
The questions propounded to the petitioners were in all material respects similar or identical to those propounded to defendant in the Blau case. The act in question, Section 876.02, F.S.A., as does the Smith Act, provides that if the evidence shows that one is "a member of, associated with * * * or affiliated with" any organization which "advocates, advises, or teaches the duty, necessity or propriety of overthrowing or overturning existing forms of constitutional government by force or violence" that is sufficient to establish guilt. It is accepted as true in this country that the Communist Party and communist front organizations take their orders from the mother organization in the Soviet Union and are dedicated to teaching and advocating the overthrow of constitutional government by force and violence and that proof of one's affiliation or membership in such organizations is a felony under the Smith Act (or under Sections 876.22 to 876.24, F.S.A.) Eisler v. United States, 84 U.S. App.D.C. 404, 176 F.2d 21, certiorari denied 337 U.S. 958, 69 S.Ct. 1534, 93 L.Ed. 1758; Appeal of Albert, 372 Pa. 13, 92 A.2d 663.
*802 The view expressed in the preceding paragraph and cases cited doubtless would not have been accepted ten years ago, at which time we were allies of the Soviet Union and knew very little of their philosophy of government. It has in the main crystallized the last few years from revelations brought to light by legislative investigations, numerous communist trials and what the public has gathered about the aims and purposes of the Communist Party from other sources. Section 876.02(4) and (5), outlawing the Communist Party, contained no finding of fact by the legislature to stimulate its passage but eight years later, when Chapter 25046, Acts of 1949, F.S.A. § 876.05 et seq., was enacted, imposing the loyalty oath for officers and employees of the State, there was a specific finding "that the Communist Party is in fact and in truth not a political party but is rather and instead a union and organization whose members are devoted adherents to the doctrine and belief in the overthrow of the government of the United States and of Florida by force or violence", that its methods "include treachery, deceit, infiltration into governmental and other institutions, espionage, sabotage, terrorism and other unlawful means".
As a prelude to Chapter 28221, Acts of 1953, F.S.A. § 876.22 et seq., an act to protect against subversive activities, there was a similar legislative finding, to which was attached the further finding that the objective of the Communist Party was "the establishment of totalitarian dictatorship in all parts of the world under its control", and to liquidate all "political parties other than the Communist Party, the abolishment of free speech, free assembly, and freedom of religion, and is the complete antithesis of the American constitutional form of government" and that the "Communist movement plainly presents a clear and present danger to the United States Government and to the State of Florida".
The Communist Control Act, passed by Congress, approved August 24, 1954, 50 U.S.C.A. § 841 et seq., is accompanied by findings of fact more sweeping than those contained in the state acts just adverted to. In connection with said act and the Subversive Control Act of 1950, 50 U.S.C.A. § 781 et seq., Congress found the communist movement to "present a clear and present danger to the security of the United States and to the existence of free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation and to guarantee to each state a republican form of government, enact appropriate legislation recognizing the existence of such world-wide conspiracy and designed to prevent it from accomplishing its purpose in the United States." See also report of sub-committee on Interlocking Subversion in Government Departments, released by Judiciary Committee U.S. Senate, for full account of these and other findings.
The Communist Decalogue, promulgated in 1943, contains among other things the following commandment: "Remember that if thou be not a devoted atheist thou canst not be a faithful communist or even a firm Soviet citizen on whom our State can rely. Atheism and communism are of one bond and these ideals are the foundation of Soviet power." Political ideals rooted in atheism have no place in a democratic society whose precepts, like ours, are rooted in God. There could be no reason for detailing the foregoing recitals and findings except to focus the reason for the changed attitude toward communist philosophy so recently developed in this country. They also serve to point the emphasis on communist antagonism to free government as well as the reason why one committed to the principles of free government or a government of law, rather than one by men, would be skeptical of communist designs.
So we find that there is no legal basis to escape the conclusion that this case is ruled by the "link in the chain of evidence" theory expounded in Blau v. United States, supra [340 U.S. 159, 71 S.Ct. 223], and Brunner v. United States, *803 supra, reversed in 343 U.S. 918, 72 S.Ct. 674, 96 L.Ed. 1332, on authority of the Blau case.
We are therefore driven to the conclusion that the commitment of relators was without legal authority and that they should be and are hereby discharged.
It is so ordered.
ROBERTS, C.J., and SEBRING, HOBSON, MATHEWS and DREW, JJ., concur.
TERRELL, J., concurs specially.
THOMAS, J., not participating.
TERRELL, Justice (concurring).
I agree to the law as promulgated in the majority opinion. I am of the view, however, that account of circumstances pointed out in said opinion the time has arrived for reinterpretation of the Fifth Amendment and the Bill of Rights in the light of newly developed circumstances. Reviewing the record of the bar of the City of New York a few years ago, Mr. Chief Justice Stone made this pertinent observation: "Life itself is change, and the law is rooted in life, the association has been wisely progressive in meeting the manifold changes which, through the years, have affected the law, the courts and the bar." Account of the circumstances detailed in the majority opinion and others of which we are conscious, there is ample warrant for the conviction that the Communist Party aims to subject all civilized societies to communist domination. If I did not feel that we were bound by the Blau and other cases cited in the majority opinion or if we had the point here initially, I would not hesitate to reinterpret the Fifth Amendment in the light of the circumstances now present.
The Supreme Court of the United States has recently expressed its willingness to reinterpret constitutional guaranties in the light of new developments. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, and other segregation cases decided last May wherein the equal protection clause of the Fourteenth Amendment was reinterpreted. If freedom of speech does not permit one to holler fire in a crowded theater, then the Fifth Amendment was never designed as a hideout to protect those who deliberately attach themselves to a conspiracy to destroy this government by force or violence and who, in order to further the purpose of that conspiracy, shoot up the House of Representatives, take a pot shot at the President, or infiltrate themselves into departments of the government where protective instrumentalities of defense are being provided and covertly convey those secrets to the enemy. Neither was it intended as a refuge for spies and traitors to hide their treachery, espionage and sabotage. I can see no logical reason for permitting one to take cover under the Fifth Amendment who attaches himself to a conspiracy to liquidate all political parties but the Communist Party, abolish free speech, free press, freedom of religion and every other tenet on which constitutional democracy is planted. I do not think the makers of the Constitution intended to extend protection to those who, to all intents and purposes, stand by with torch or dagger to effectuate such avowals. No constitutional guaranties are absolutes, all have been qualified from time to time as the public safety and welfare requires.
There is another important consideration that supports this thesis. Students of American Constitutional History have long since satisfied themselves as to origin and reason for each provision of the Bill of Rights except the Fifth Amendment against self-incrimination. Similar provisions were included in seven Colonial constitutions: Virginia, Pennsylvania, Maryland, North Carolina, Vermont, Massachusetts and New Hampshire. Provision against self-incrimination was a part of the Confederate Constitution and is a part of the Constitution of every state in the Union but New Jersey and Iowa. It was never a part of Magna Charta, the Petition of Rights or the English Bill of Rights. In Twining v. New *804 Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97, the Supreme Court pointed out that when the Union was formed the principle that no person could be compelled to be a witness against himself had become embodied in the common law and distinguished it from all other systems of jurisprudence. It was then and is still regarded as a valuable privilege, a shield for the innocent, maybe a protection to the guilty and is a safeguard against heedless, unfounded or tyranical prosecutions.
Prof. Wigmore and others have suggested that the explanation for the provision against self-incrimination might have originated in the agitation against an Ordinance in France in 1670 embodying compulsory self-incrimination, but the better source seems to be that intimated in Twining v. New Jersey, supra, which was likely gleaned from these sources. All the charters for establishment of the Colonies were accompanied by instructions that justice be administered as near as possible in keeping with the common law of England. To swear falsely or take an oath untruly was punishable by death. If one used disgraceful words he did so "upon pain of being tied head and feet together, upon the guard every night for the space of a month." Ministers and magistrates who were often of the clergy opposed the enactment of statute law. They preferred to supplement the common law of England by decisions based on the Old Testament. Prior to the Revolution about as many copies of Blackstone's Commentaries of 1772 were sold in the Colonies as were sold in England. In its administration the common law was often harsh and inhuman.
Puritan England's attitude to the privilege against self-incrimination, the tyranny of Charles the First and other impositions did much to bring it about. Petitions to Parliament in 1647 contained numerous demands, one of which was to secure the privilege against self-incrimination. In fine, at the time of the English Bill of Rights in 1689 the privilege against self-incrimination was well recognized as part of English custom. Coeval with the agitation for privilege against self-incrimination in England, a like agitation for it was going on in the American colonies. So determined were they to secure it that they placed the ecclesiastical oath, testamentary compulsion, enforced conformance to the established church and other requirements against conscience became so obnoxious that they were placed in the category of tortures with the rack, the foot and the thumbscrew. The ex-officio and the inquisitorial oath produced a like reaction. The indiscriminate imposition of the oath and torture to convict those who participated in the rebellion crystallized sentiment against enforced incrimination.
It has been pointed out by others that the real reason for including the privilege against self-incrimination in the Constitution may be traced to the prerogative crown courts of Governor and Council, including the supreme Colonial courts and proceedings employed to enforce the laws of the colonies. As the colonies became royal provinces persons would be called before the Governor and Council, which sat as a court of inquiry, their proceedings being inquisitorial and unbearable. They would secure confessions, upon which convictions would be secured before a jury or a summary sentence might be imposed. The accused were sometimes imprisoned or severely handled. The House of Burgesses which contained the majority of those who approved the first Constitution and Bill of Rights in America and were the first to make the privilege against self-incrimination part of the Constitution, protested violently. George Mason's draft of the Bill of Rights, the first instrument of its kind in history, was adopted by Virginia unanimously 22 days ahead of the Declaration of Independence. From these impositions and others it has been said that the provisions of the Bill of Rights in the Federal Constitution against compulsory self-incrimination was not only a shield against the evils incident to a new and inexperienced sovereignty, they were in answer to many other examples of colonial or English oppression and misrule. All of which appears to me to be the more plausible basis for the privilege against self-incrimination.
*805 I think these considerations warrant the placing of some qualification on what protection one may claim under the Fifth Amendment. The historical background which actuated placing immunization from personal incrimination in the State and Federal Constitutions certainly did not have in mind shielding those who by treasonable designs sought the destruction of the government our forefathers created. I therefore concur in the majority opinion.