382 So.2d 56 (1980)
STATE of Florida, Appellant,
v.
Louis J. TSAVARIS, Appellee.
No. 79-1160.
District Court of Appeal of Florida, Second District.
March 6, 1980.
Rehearing Denied April 8, 1980.
*59 Jim Smith, Atty. Gen., Tallahassee, and William I. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellant.
Gerald C. Surfus of Lee & Surfus, Sarasota, and Michael L. Kinney of Mulholland, Kinney & Anderson, Tampa, for appellee.
DANAHY, Judge.
Dr. Louis J. Tsavaris, a Tampa psychiatrist, was indicted for the first degree murder of one of his patients, Cassandra Ann "Sally" Burton. Anticipating that the state would introduce certain evidence against him, Dr. Tsavaris requested the trial judge to suppress that evidence on statutory and constitutional grounds. The trial judge did so and the state appeals. We affirm in part and reverse in part.
There has been no trial in this case; for purposes of this appeal, the parties accept the statement of facts set forth in Tsavaris v. Scruggs, 360 So.2d 745 (Fla. 1977). As recited in that opinion, Dr. Tsavaris called the morgue in Tampa three times to inquire about the results of the Sally Burton autopsy. The trial judge suppressed a tape recording of the first of these conversations and all testimony regarding that conversation on the ground that the recording was an unlawful interception of a wire communication under Chapter 934, Florida Statutes (1979).[1] We affirm the suppression of the tape recording but hold that testimony as to the telephone conversation is admissible and reverse that part of the trial judge's order suppressing such testimony.
In Tsavaris v. Scruggs, supra, Dr. Tsavaris asserted unsuccessfully that he was immune from prosecution for the murder of Sally Burton because the state, as part of its investigation into her death, obtained and served subpoenas duces tecum on Dr. Tsavaris' secretary, who produced certain of his office records pursuant to the subpoenas. Following the supreme court's adverse ruling on the immunity claim in Tsavaris v. Scruggs, the trial judge granted Dr. Tsavaris' motion to suppress those records, holding that the state's acquisition of the records violated Dr. Tsavaris' rights under the Fourth Amendment to the United States Constitution. We hold that no provision of the United States Constitution or of the Florida Constitution requires suppression of the subpoenaed records and reverse the order suppressing them as evidence in this case.
We will discuss separately our reasoning with respect to the admissibility of evidence pertaining to the tape recorded telephone conversation and the admissibility of the office records produced pursuant to the state's subpoenas. We begin, however, with a common law rule applicable to both categories of evidence; the rule is that *60 the means by which evidence is obtained  whether lawful or unlawful, proper or improper  does not affect its admissibility unless those means invoke legislation prohibiting the introduction of the evidence or unless the constitutional rights of the defendant require that the evidence be excluded. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); 8 Wigmore, Evidence, Section 2183 (McNaughton rev. 1961). We have found nothing in the decisions of our supreme court modifying this common law rule. Accordingly, in our review of the orders suppressing evidence in this case, we are required to determine whether there is any federal or state legislation prohibiting the introduction of the evidence or, in the absence of any such legislation, whether the constitutional rights of Dr. Tsavaris require that the evidence be excluded.

The Tape Recorded Telephone Conversation
Sally Burton was officially pronounced dead shortly after midnight on Saturday, April 19, 1975. On that Sunday morning, April 20, Detective Ronald Poindexter of the Hillsborough County Sheriff's Department went to the morgue at Tampa General Hospital to confer with Dr. John R. Feegel, who was the medical examiner for Hillsborough County, concerning the autopsy scheduled for that morning on Sally Burton's body.[2] He had just been told by a close friend of Miss Burton that Miss Burton and Dr. Tsavaris had been having an affair; that Miss Burton had become pregnant; that she had undergone an abortion only four weeks earlier; that she had not wanted the abortion, but Dr. Tsavaris insisted; that the couple's relationship was a stormy one; and that they had recently quarreled over Miss Burton's demand that Tsavaris obtain a divorce in order to marry her.
When he arrived at the morgue, Detective Poindexter relayed to Dr. Feegel the substance of the information he had just been given, particularly about the abortion, specifically mentioning that Dr. Tsavaris was Miss Burton's psychiatrist and possibly her lover, and that he was involved in the circumstances surrounding her death.
While Detective Poindexter was thus engaged in conversation with Dr. Feegel, Dr. Feegel's telephone rang. Dr. Feegel answered on his speaker phone, so that the voice of the caller was audible to both Dr. Feegel and Detective Poindexter. The caller asked "who is this?" and Dr. Feegel identified himself. The caller then said "this is Dr. Tsavaris." Hearing that, Detective Poindexter and Dr. Feegel exchanged glances, but did not otherwise communicate, and Dr. Feegel clicked on a recording device.[3] He asked the caller to identify himself again, whereupon the voice over the phone pronounced the name of Tsavaris and spelled it. That response and the remainder of the conversation were recorded. It is not disputed that the caller was in fact Dr. Tsavaris.
In the course of this first telephone conversation, Dr. Feegel said he did not yet have the Sally Burton autopsy results. Dr. Tsavaris asked if he could call back and Dr. Feegel suggested that he do so at 1:30 p.m. Dr. Tsavaris called back at 1:30, was told by Dr. Feegel that the cause of death had not been determined, and called a third time at 4:00 p.m. that day. Officers from the Sheriff's Department recorded the second and third conversations on Sheriff's Department recording equipment. The trial judge denied Dr. Tsavaris' motion to suppress those recordings and Dr. Tsavaris does not challenge that ruling on this appeal.
Although there is a federal law which regulates the interception of wire *61 communications by means of electronic devices, neither that nor any federal statute imposes a restriction on the surreptitious recording of a telephone conversation by one of the participants. Furthermore, the United States Constitution offers no protection to a nonconsenting participant whose conversation is recorded without his knowledge by the party to whom he is speaking, even if that party is a government agent. United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).
Thus we must look to Florida statutes and the Florida Constitution to determine whether there is any impediment to admitting evidence of the telephone conversation between Dr. Tsavaris and Dr. Feegel which Dr. Feegel recorded. The only possible statutory prohibition is Section 934.06, Florida Statutes (1979), which provides in part that:
Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial ... if the disclosure of that information would be in violation of this chapter. [Emphasis added]
Section 934.03(1)(c) makes it a crime to willfully disclose the contents of any wire communication knowing or having reason to know that the information was obtained through the interception of a wire communication in violation of Section 934.03(1). Section 934.03(1)(a) makes it a crime to willfully intercept a wire communication except as specifically permitted by Chapter 934. Our first inquiry, then, is whether Dr. Feegel's recording of his telephone conversation with Dr. Tsavaris was permitted under Chapter 934.
We have no difficulty with the listening in by Detective Poindexter, even though he was not a participant in the conversation and Dr. Tsavaris certainly was not aware that he was listening. An interception under Chapter 934 can only occur through the use of an electronic, mechanical or other device. Section 934.02(3). A telephone instrument furnished to a subscriber or user and being used by the subscriber or user in the ordinary course of business is specifically excluded from the scope of the words "electronic, mechanical or other device." Section 934.02(4). Dr. Feegel answered the telephone when Dr. Tsavaris called by using his speaker phone; in doing so he used his telephone equipment in the ordinary course of business. The result would be the same if he had answered first on the regular telephone receiver and then punched the speaker phone so that Detective Poindexter could hear.
There is a further reason why Detective Poindexter's hearing the conversation did not constitute a prohibited interception. Section 934.03(2)(c) provides that:
It is lawful under this chapter for a law enforcement officer or a person acting under the direction of a law enforcement officer to intercept a wire or oral communication when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception and the purpose of such interception is to obtain evidence of a criminal act.
The state sought to bring Dr. Feegel's recording of the telephone conversation within the above provision by arguing that, under Florida statutes pertaining to the duties of a medical examiner, Dr. Feegel was a law enforcement officer; or, alternatively, that Dr. Feegel was acting under the direction of a law enforcement officer, Detective Poindexter, when he made the tape recording in question.
We agree with the trial judge that Dr. Feegel did not occupy the position of a law enforcement officer. Section 936.003(1), Florida Statutes (1979), does provide that all the duties and responsibilities of a coroner (with a limited exception) are vested in the medical examiner and it may be, as the state argues, that at common law, coroners were among those officers having the right to arrest. However, Section 936.003(1) was not in effect in 1975.
We also agree with the trial judge's finding that Dr. Feegel was not acting under *62 the direction of Detective Poindexter when he made the tape recording. An exchange of glances may convey a world of meaning, but we believe more is required to establish that one party received a specific direction from the other.
With respect to the interception of a wire communication by a person who is not a law enforcement officer and who is not acting at the direction of a law enforcement officer, Section 934.03(2)(d) provides:
It is lawful under this chapter for a person to intercept a wire or oral communication when all of the parties to the communication have given prior consent to such interception.
If, therefore, Dr. Feegel's tape recording constituted an interception, it was not lawful because Dr. Tsavaris, a party to the communication, did not give his prior consent to the interception.
In State v. News-Press Pub. Co., 338 So.2d 1313 (Fla. 2d DCA 1976), this court held that the tape recording of a telephone conversation by one party to the conversation without the consent of the other party was an illegal intercept. We pointed out that the provision in Section 934.03(2)(d) requiring the consent of all parties for a lawful interception was enacted in 1974 and that prior to 1974, Section 934.03(2)(d) required the consent of only one party to a conversation for a lawful interception. We reasoned that the legislative change in 1974 requiring the consent of all parties clearly made unlawful the recording of a conversation by one party without the consent of the other. Having in this case an opportunity to reconsider our holding in State v. News-Press Pub. Co., supra, we believe that our conclusion in that case was incorrect.
Chapter 934 was patterned after Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. Sections 2510 et seq. (hereinafter called Title III). Title III was enacted in 1968 and Chapter 934 in 1969. The pre-1968 federal law on the subject was part of the Communications Act of 1934 and was codified at 47 U.S.C. Section 605. Until 1978 Section 605 provided that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person." Title III amended Section 605 to insert the word "radio" before the word "communication", consistent with the congressional purpose to place future regulation of the interception of wire or oral communications in the provisions of Title III. The secret recording of a telephone conversation by a participant was not considered prohibited by Section 605 prior to 1968 and is not prohibited by Title III.[4]
Title III, at 18 U.S.C. Section 2511(2)(c) and (d), provides that it is not unlawful for a person to intercept a wire or oral communication if that person is a party to the communication or one of the parties to the communication has given prior consent to such interception.[5] This court's premise in State v. News-Press Pub. Co., supra, was that the lawfulness of participant recording of a telephone conversation under federal law reposes in Section 2511, which Chapter 934 followed until 1974. We concluded, therefore, that when the Florida legislature amended Chapter 934 in 1974 to require the consent of all parties for the lawful interception of a communication, the legislature intended to forbid the secret recording of a telephone conversation by one of the participants.
Our premise was incorrect; the federal rule permitting the recording of a telephone conversation by one party thereto is based on the meaning of the word "interception."[6] Since pre-1968 federal law (47 *63 U.S.C. Section 604) required the consent of the "sender" for a lawful interception and since each party to a telephone conversation could be considered both a sender and a receiver, federal courts avoided the consent problem by reasoning that the recording of a telephone conversation by one party to the conversation did not constitute an interception.
In Carnes v. United States, 295 F.2d 598 (5th Cir.1961) cert. denied, 369 U.S. 861, 82 S.Ct. 949, 8 L.Ed.2d 19 (1962), the court discussed the development of federal decisional law on the meaning of the word "intercept" as used in Section 605. As noted in that case, beginning with the decision in United States v. Yee Ping Jong, 26 F. Supp. 69 (W.D.Pa. 1939), and culminating with the decision of the United States Supreme Court in Rathbum v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), federal courts adopted the position that the recording of a conversation by a participant could not be a taking or a seizure of a communication in the course of transmission or before arrival at the destined place. In Rathbun v. United States, supra, the Supreme Court said that one entitled to receive a communication may use it for his own benefit or have another use it for him; the communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone. The court observed that the parties in that case conceded that any participant may record a telephone conversation and publish it.
Other federal courts followed the holding in the Carnes case that a recording of a conversation could not be an interception if it was made by a party to the conversation or with his consent. Amsler v. United States, 381 F.2d 37 (9th Cir.1967); Glacy v. United States, 361 F.2d 31 (1st Cir.1966), cert. denied, 385 U.S. 831, 87 S.Ct. 69, 17 L.Ed.2d 67 (1966). These courts adopted the reasoning of the Carnes case that the only difference between a person testifying to a conversation in which he participated and the introduction of a recording of the conversation is that the recording has the advantage of furnishing trustworthy evidence; since the party would be free to divulge the contents of the conversation in the courtroom or elsewhere, the only function served by the recording is to preserve a permanent and accurate record of the conversation. Thus the court in the Amsler case said "tape recordings do not differ in principle from testimony as to the contents of conversations."
After 1968 federal courts continued to apply the same reasoning under Title III. United States v. Bastone, 526 F.2d 971 (7th Cir.1975), cert. denied, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976); United States v. Harpel, 493 F.2d 346 (10th Cir.1974); Smith v. Wunker, 356 F. Supp. 44 (S.D.Ohio 1972). As succinctly stated in United States v. Santillo, 507 F.2d 629 (3d Cir.1975), "the mechanical ear of the recorder is no different than the ear of a listener with a precise memory."
Section 605 has never contained a definition of the word "intercept". There is a specific definition of the word, however, in Title III (18 U.S.C. Section 2510(4)). Chapter 934 contains the same definition, which is:
"Intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.
The court in United States v. Harpel, supra, explained the application of this definition to the recording of a telephone conversation:
We agree with appellant that the recording of a conversation is immaterial when the overhearing is itself legal. It is the means whereby the contents of the conversation are acquired that is crucial... . A recording device placed next to, or connected with, a telephone receiver cannot itself be the "acquiring" mechanism. It is the receiver which serves this *64 function  the recorder is a mere accessory designed to preserve the contents of the communication. This interpretation comports squarely with the distinction drawn between "intercepting" and "recording" under 18 U.S.C. § 2518 (8)(a), which deals with judicially authorized interceptions:
The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. [Emphasis added][7]
We therefore conclude that the tape recorder in question cannot constitute the intercepting mechanism when used, as it is argued here, connected to a telephone receiver.
Id. at 350.
State courts have adopted the federal view in determining that participant recording of a conversation is not an interception under state law. State v. Birge, 240 Ga. 501, 241 S.E.2d 213 (1978), cert. denied, 436 U.S. 945, 98 S.Ct. 2847, 56 L.Ed.2d 786 (1978); Cross v. State, 128 Ga. App. 837, 198 S.E.2d 338 (Ct.App. 1973); State v. McDermott, 167 N.J. Super. 271, 400 A.2d 830 (Super. Ct.App.Div. 1979); State v. Gora, 148 N.J. Super. 582, 372 A.2d 1335 (Super.Ct. App.Div. 1977); Cogdill v. Commonwealth, 219 Va. 272, 247 S.E.2d 392 (1978); Pearson v. State, 556 P.2d 1025 (Okl.Cr.App. 1976), cert. denied, 431 U.S. 935, 97 S.Ct. 2644, 53 L.Ed.2d 252 (1977).
In State v. News Press Pub. Co., supra, this court cited two federal court decisions. In one of these, United States v. Turk, 526 F.2d 654 (5th Cir.1976), cert. denied, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), the Fifth Circuit Court of Appeals quoted the definition of "intercept" in Title III and then made the statement that "Kabbaby's action in recording his conversation with Turk was clearly an interception under this definition." The court cited no authority for that statement and ignored its long-standing and often-cited decision to the contrary in Carnes v. United States, supra. We find only two decisions of state courts following Turk in this respect. People v. Hopkins, 93 Misc.2d 501, 402 N.Y.S.2d 914 (Sup.Ct. 1978); Rupley v. State, 93 Nev. 60, 560 P.2d 146 (1977).
The other case which we cited in State v. News Press Pub. Co. was Smith v. Wunker, supra. The court in that case clearly based its holding on the meaning of the word "interception." After quoting the statutory definition of "interception" the court said:
The words "aural acquisition" literally translated mean to come into possession through the sense of hearing... .
We conclude the recording of a private conversation by a party to it and its subsequent disclosure does not violate 18 U.S.C. § 2511(2)(d) or any other section... .
... The means of "aural acquisition" in this case is the telephone itself... . We note that the defendant as a party to the conversation could have repeated it verbatim without the use of a recording device and that would not come within the purview of 18 U.S.C. § 2515.
Id. at 46.
In Tollett v. State, 272 So.2d 490 (Fla. 1973), our supreme court said:
[I]t is an elementary rule of evidence that a party to a discussion or communication with a defendant may take the witness stand and testify, subject to cross-examination, as to the contents of his communication or discussion with a defendant and this can include as a logical concomitant to his testimony any tape or electronic recordings of such communications or discussions which he himself made or which he authorized (consented for) police officers to make.
Id. at 494.
The United States Supreme Court took the same view in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963):

*65 [T]his case involves no "eavesdropping" whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose.
373 U.S. at 439, 83 S.Ct. at 1388.
Based on the foregoing authorities, we would recede from our holding in State v. News Press Pub. Co., supra, if we were free to do so, and hold in this case that Dr. Feegel's tape recording of his conversation with Dr. Tsavaris was not an interception within the meaning of Chapter 934. We may not do so, however, because we are bound to follow the case law on the subject set forth by our supreme court. Hoffman v. Jones, 280 So.2d 431 (Fla. 1973). We believe the supreme court has foreclosed our reconsideration of the question by its holding in State v. Walls, 356 So.2d 294 (Fla. 1978). In that case a victim of extortion secretly recorded a conversation which occurred in his home between himself and the alleged extortioners during which extortionary threats were made. The trial judge suppressed the recording as evidence against the extortioners on the ground that it was an illegal interception under Chapter 934 and the supreme court upheld that decision. We believe the Walls case requires the same result when the recorded conversation is over the telephone, as in this case. Accordingly, we must hold, and we do hold, that the tape recording by Dr. Feegel of his first telephone conversation with Dr. Tsavaris was an unlawful interception under Chapter 934. We view the Walls case as establishing the rule that unless the recording party is a law enforcement officer or is acting under the direction of a law enforcement officer, the recording of a conversation by one of the conversants without the consent of all parties is unlawful.
In the case before us, Dr. Feegel's action in punching his tape recorder when Dr. Tsavaris called the first time produced a legal complication which has delayed the trial of this case for many months. Had Detective Poindexter punched the recorder, or specifically directed Dr. Feegel to do so, the problem likely would not have been presented. We wonder whether the legislature intended such nuances.
In Hoffman v. Jones, supra, the supreme court observed that district courts of appeal are not powerless to seek change; they are free to certify questions of great public interest to the supreme court for consideration, and even to state their reasons for advocating change. We, therefore, certify the following question to the supreme court as a question of great public interest:
Does the recording of a conversation by one of the participants constitute the interception of a wire or oral communication within the meaning of Chapter 934, Florida Statutes (1979)?
Having held that Dr. Feegel's recording of his first telephone conversation with Dr. Tsavaris constituted an unlawful interception, we must now determine whether Chapter 934 requires that the tape recording be suppressed as evidence and, if it must be suppressed, whether the testimony of Dr. Feegel and Detective Poindexter as to the conversation must also be suppressed. Chapter 934 imposes criminal sanctions and civil liability for an unlawful interception. Exclusion from evidence is an additional remedy which cannot be imposed in the absence of a legislative enactment so requiring. People v. Livingston, 64 Mich. App. 247, 236 N.W.2d 63 (Ct.App. 1975).
Section 934.06 provides that whenever a communication has been intercepted, no part of the contents of that communication and no evidence derived therefrom may be received in evidence if the disclosure of that information would be in violation of Chapter 934. "That information" clearly refers to the contents of the communication. Evidence derived "therefrom" refers, in our view, to evidence derived from the contents of the communication.
Section 934.03(1)(c) makes it a crime to willfully disclose the contents of a communication knowing or having reason to know *66 that the information was obtained through an unlawful interception. Section 934.02(7) provides that the word "contents", when used with respect to a wire or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication.
Certainly, the playing of the tape recording made by Dr. Feegel would constitute the disclosure of the contents of the communication between him and Dr. Tsavaris. That disclosure is prohibited if the contents were obtained through an unlawful interception. As explained above, we do not believe that the contents of the communication were obtained (aurally acquired) by means of the tape recording.
Nevertheless, we again are bound by the supreme court's holding in State v. Walls, supra. In that case the court ruled that the unlawfulness of a tape recording of a conversation requires that the tape recording be excluded from evidence. We hold, therefore, that the trial judge properly suppressed the tape recording which Dr. Feegel made of his first telephone conversation with Dr. Tsavaris.
It would appear, then, that the testimony of Dr. Feegel and Detective Poindexter regarding the conversation should also be excluded. Logically, if the tape recording is to be excluded because its playing would constitute the disclosure of the contents of the communication, then exclusion of all testimony regarding the conversation is also required, since that also would constitute a disclosure of the contents. In this respect, however, State v. Walls, supra, requires that we reverse. In that case, after holding that the tape recording made by the extortion victim of his conversation with his extortioners was unlawful and should be suppressed, the court said "no harm derives from the suppression of the tape recording since the victim is free to testify as to the alleged extortionary threats." Other courts have held that the testimony of a participant in a conversation is admissible though a tape recording of the conversation is not. Pennington v. State, 19 Md. App. 253, 310 A.2d 817 (Ct.Spec.App. 1973), cert. denied, 419 U.S. 1019, 95 S.Ct. 492, 42 L.Ed.2d 292 (1974); State v. Grant, 9 Wash. App. 260, 511 P.2d 1013 (Ct.App. 1973), cert. denied, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 78 (1974); State v. Smith, 72 Wis.2d 711, 242 N.W.2d 184 (1976). At least one court, however, has ruled to the contrary, peremptorily dismissing as "novel" the argument that testimony regarding an intercepted telephone conversation is admissible because the witness is testifying from his personal recall of the conversation and not from the illegally obtained tapes. Rupley v. State, 93 Nev. 60, 560 P.2d 146 (1977).
We hold that the testimony of Dr. Feegel and Detective Poindexter regarding the first telephone conversation between Dr. Feegel and Dr. Tsavaris is admissible and reverse the trial judge's order of suppression to the extent that he suppressed that testimony.
We would be remiss if we did not consider whether Article I, Section 12 of the Florida Constitution requires any different result in this case. That section provides in part that the right of the people to be secure in their persons, houses, papers and effects against the unreasonable interception of private communications by any means shall not be violated. The section further provides that "articles or information obtained in violation of this right shall not be admissible in evidence." Although presumably Article I, Section 12, applies only to state action as distinguished from private action, the argument could be made that Dr. Feegel's action in recording his first telephone conversation with Dr. Tsavaris was state action in view of the fact that Dr. Feegel held the office of medical examiner pursuant to Florida law and was acting in that capacity at the time. In our view, participant recording of a conversation is not an interception of a private communication. Therefore, Article I, Section 12, is not applicable.

The Subpoenaed Office Records
On Monday morning following Sally Burton's death on Saturday night, detectives *67 from the Hillsborough County Sheriff's Department interviewed Chris Carlton, Dr. Tsavaris' part-time secretary. Apparently Dr. Tsavaris' office records were described and discussed in that interview. Miss Carlton declined to give the detectives any of the records or information from the records, stating that this information was confidential and disclosure would be unethical.
Later that same morning four detectives from the Sheriff's Department and an assistant state attorney went to Dr. Tsavaris' office. One member of the party served two subpoenas duces tecum on Jean Jones, Dr. Tsavaris' full-time secretary. Each subpoena was addressed to "custodian of records, 4600 Habana Suite 28, Tampa, Fla. (Office of Dr. Louis Tsavaris)." Each commanded the "custodian of records" to appear before the state attorney instanter. One subpoena directed that she bring with her all medical records relating to Cassandra Burton a/k/a Sally Burton, a/k/a Sandra Burton. The other subpoena directed the custodian to bring with her the personal appointment book of Dr. Tsavaris for the month of April, 1975.
Jean Jones thereupon went with two detectives to the office of the state attorney and there turned over to the state attorney four sets of records from Dr. Tsavaris' office. Personnel at the state attorney's office made copies of those records and returned the originals to Jean Jones.
The office records thus obtained by the state attorney were (1) sign-in sheets used for group therapy sessions, on which the patients signed their names and their comments about their feelings; (2) Dr. Tsavaris' appointment book, showing his daily appointments with patients, both groups and individuals; (3) a telephone ledger used to log incoming calls to Dr. Tsavaris' office and to note calls which he requested his secretary to make; and (4) Sally Burton's medical records.
With the exception of Sally Burton's medical records, Jean Jones maintained all of these records for Dr. Tsavaris in her capacity as his secretary. Both the appointment book and the telephone ledger were kept on her desk. After a group session, either Jean Jones or Chris Carlton made a record of attendance and put the sign-in sheet in a file for that particular group.
Dr. Tsavaris asserts that the state attorney obtained the foregoing records in violation of Dr. Tsavaris' rights under the Fourth and Fifth Amendments to the United States Constitution and under corresponding provisions of the Florida Constitution. He also argues that the records should be suppressed because the subpoenas duces tecum were defective and were improperly served, and points out that an assistant state attorney stipulated in the record of this case that the service of the subpoenas as well as the subpoenas were invalid. The state maintains that this stipulation was for a limited purpose and is not binding on the state.
The trial judge declined to rule on the question whether the subpoenas were invalid and were invalidly served, and whether the state is bound by its stipulation on that question. In this he was eminently correct. The duty rests on the subpoenaed witness, in this case Miss Jones, to object to the form of process served upon her; if a witness appears in response to defective process and fails to interpose any objections to the form or service of the process, the witness waives any right to be heard at a later date on those matters. Coleman v. State, 134 Fla. 802, 184 So. 334 (1938). The illegal issuance of a subpoena to a witness is not grounds for suppression of the witness' evidence on motion of the defendant in a criminal case. Objections to the legality of a subpoena are personal to and may be asserted or waived only by the person searched or examined. "It was never heard that the defendant could object to the violation of the privileges of others not claimed by them because that violation discovers evidence by which he is convicted." Sachs v. Government of the Canal Zone, 176 F.2d 292 (5th Cir.1949), cert. denied, 338 U.S. 858, 70 S.Ct. 200, 94 L.Ed. 525 (1949). A defective subpoena adds nothing to a Fourth Amendment claim. U.S. v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 *68 (1976). We cannot see that it adds anything to a Fifth Amendment claim.
Dr. Tsavaris' first constitutional claim arises under the Fourth Amendment to the United States Constitution and under Article I, Section 12, of the Florida constitution. Both provide that the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated. The Florida constitution expressly states that any articles or information obtained in violation of Article I, Section 12, shall not be admissible in evidence. Evidence obtained by a search and seizure in violation of the Fourth Amendment to the United States Constitution is inadmissible in state courts under the due process clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
This court has recently held that the search and seizure provision of the Florida constitution imposes no higher standard than that of the Fourth Amendment to the United States Constitution. State v. Hetland, 366 So.2d 831 (Fla. 2d DCA 1979). Therefore, we will discuss Dr. Tsavaris' claim under the search and seizure clauses of both constitutions as a Fourth Amendment claim. Basically, his claim is that the records of his office relinquished to the state attorney by his secretary were the product of a warrantless search and seizure which violated the Fourth Amendment. Unless a warrantless search falls within one of the delineated exceptions to the Fourth Amendment warrant requirement, it is unreasonable and violative of the Fourth Amendment. Uleski v. State, 379 So.2d 121 (Fla. 2d DCA 1979).
Dr. Tsavaris' second claim arises under the Fifth Amendment of the United States Constitution and under Article I, Section 9, of the Florida constitution. Both provide that no person shall be compelled in any criminal case to be a witness against himself. These clauses protect a person's privilege against self-incrimination. The Fifth Amendment applies to the states under the due process clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).
We have not previously had occasion to consider whether the self-incrimination clause of the Florida constitution affords any greater protection than the Fifth Amendment, and we have found no decision of our supreme court on that question. The supreme court has, however, referred to the self-incrimination clause in Article I, Section 12, as a "rescript" of the Fifth Amendment to the United States Constitution. State v. Kelly, 76 So.2d 798 (Fla. 1954). In determining whether the self-incrimination clause of the Florida constitution has been violated, the supreme court seems to be guided by federal court interpretations of the Fifth Amendment. E.g., State v. Kelly, supra; State v. Willard, 54 So.2d 179 (Fla. 1951). Accordingly, we conclude that the protection against self-incrimination afforded by Article I, Section 9, of the Florida constitution is no greater than that under the Fifth Amendment to the United States Constitution. We will discuss Dr. Tsavaris' self-incrimination claim as a Fifth Amendment claim.
As noted above, Dr. Tsavaris first asserted that he was immunized from prosecution for the murder of Sally Burton under Section 914.04, Florida Statutes (1979) by reason of his secretary's compliance with the subpoenas duces tecum. The supreme court rejected that claim in Tsavaris v. Scruggs, 360 So.2d 745 (Fla. 1978). In its opinion in that case the court discussed the implications of the Fourth and Fifth Amendments, but we do not read the opinion as a ruling on whether either of those amendments were violated in this case. In our view the supreme court held only that Section 914.04 conferred no immunity on Dr. Tsavaris and that the Fifth Amendment did not require that Dr. Tsavaris be held immune from prosecution. Even where incriminating evidence is obtained in violation of the Fifth Amendment, the defendant against whom that evidence was obtained is at most entitled to suppress the evidence and its fruits if they are sought to be used *69 against him at trial. United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). The supreme court specifically stated that it was expressing no opinion on whether the subpoenaed materials from Dr. Tsavaris' office should be suppressed on account of the Fourth Amendment or on account of Article I, Sections 9 and 12, of the Florida constitution. We assume its omission of the Fifth Amendment in that statement was inadvertent.
Certainly Dr. Tsavaris' office records are private as distinguished from public records. For purposes of our decision we will assume that they are incriminating. Notwithstanding these factors, however, we find no violation of the Fourth or Fifth Amendments and reverse the trial judge's suppression of these records as evidence against Dr. Tsavaris.
In an early decision, the United States Supreme Court held that both the Fourth and Fifth Amendments were implicated when the defendants in a criminal case were served with a judicial notice requiring them to produce a self-incriminating and private document. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The Court said that the compulsory extortion of a man's private papers to be used as evidence against him in a criminal proceeding should be condemned and that in this regard the Fourth and Fifth Amendments run almost into each other. The Court said further in regard to the interplay of the two amendments that the unreasonable searches and seizures condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man in a criminal case to be a witness against himself, which is condemned in the Fifth Amendment, throws light on the question of what is an unreasonable search and seizure within the meaning of the Fourth Amendment.
Thus under the Boyd approach, the private content of documents would invoke the protection of both the Fourth and Fifth Amendments. A leading authority has vigorously protested that the Fourth and Fifth Amendments do not interplay as suggested in Boyd, pointing out that the two doctrines have had totally different political and legal histories. 8 J. Wigmore, Evidence, 383 note 4 (McNaughton rev. 1961). Over the years the decisions of the United States Supreme Court receded from the Boyd view, establishing a clear dichotomy between the Fourth and Fifth Amendments. Ninety years after Boyd, the Court rendered two decisions making it clear that the application of these two amendments to documentary evidence is determined by the means employed to obtain the evidence, not by the content of the evidence as expressed in Boyd. Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); Note, Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv.L. Rev. 945 (1977).
Florida decisions have reflected the Boyd view. In State v. Willard, 54 So.2d 179 (Fla. 1951) our supreme court held that the seizure under search warrant of a man's private papers for the sole purpose of finding sufficient evidence therein upon which to predicate an indictment, and the subsequent use of such papers as evidence to prove the charge contained in the indictment, is the equivalent of compelling such a person to produce private papers as evidence against himself. In that case the court found that the self-incrimination clauses of the federal and Florida constitutions were violated when books and records belonging to the defendants in a criminal case were obtained by the state through the execution of a search warrant. In State v. Dawson, 290 So.2d 79 (Fla. 1st DCA 1974), subpoenas duces tecum were served on office employees of a defendant requiring them to appear before the grand jury and bring with them certain of the defendant's records. The First District Court of Appeal held that the defendant's privilege against self-incrimination was violated, citing Boyd v. United States, supra. The court said "we *70 think there is no difference whatsoever in compelling a man to be a witness against himself and in seizing his records to be used against him. They are both constitutionally protected rights."
On the federal level, however, the United States Supreme Court rendered decisions dispelling two of Boyd's propositions: (1) that the service of a subpoena duces tecum constituted a search and seizure, and (2) that incriminating documentary evidence which cannot be compelled from a defendant also cannot be seized from him by a search even if pursuant to a valid search warrant.[8]
On the first point, the Court ultimately adopted the view of Justice Miller as expressed in his concurring opinion in the Boyd case. Justice Miller objected to implicating the Fourth Amendment in a case involving the issuance and service of a subpoena duces tecum, contending that there is no search and seizure in such a case. In re Horowitz, 482 F.2d 72 (2d Cir.1973), cert. denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973), traced the development of the Supreme Court's position on the application of the Fourth Amendment to a subpoena duces tecum and reached the conclusion that, as far as the Fourth Amendment is concerned, the only requirements are that the subpoena must not be unduly burdensome, and the subpoenaed documents must be relevant in purpose. The Supreme Court has cited that decision with approval. Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).
Recently, in Hynes v. Moskowitz, 44 N.Y.2d 383, 406 N.Y.S.2d 1, 377 N.E.2d 446 (Ct.App. 1978), appeal dismissed, 439 U.S. 888, 99 S.Ct. 243, 58 L.Ed.2d 234 (1978), the Court of Appeals of New York had occasion to consider a Fourth Amendment argument directed to a subpoena duces tecum issued by a grand jury. The court said:
All that is required under the State and Federal Constitutions is that the subpoenaed materials be relevant to the investigation being conducted and that the subpoena not be overbroad or unreasonably burdensome... .
This constitutional guarantee seeks to balance the interests of society in discovering evidence of criminal activity with the right of the individual to be free from unjustifiable governmental intrusions. To be sure, an intrusion imposed on a person subject to a search and seizure is substantial. A search is conducted without advance notice and the scene of the search may be an individual's home. Where resistance is encountered, the search may be effected by the threat or use of force. These considerations demand that a warrant issue only if supported by probable cause.
But these considerations do not apply with equal force to the Grand Jury subpoena duces tecum... . It is served in the same manner as any other legal process, and may be challenged, before compliance, in a motion to quash... . If the motion to quash is denied and compliance ordered, no search is conducted, nor is there a threat or actual use of force... . Rather, the materials sought are furnished by the subpoenaed person himself at a time and place prescribed by the court. It should also be noted that a search warrant, unlike the subpoena, is not a preliminary investigative tool, but is rather a device for obtaining evidence intended to be used against a defendant where probative support of his guilt is already known to the authorities. Clearly, the concerns which require that constitutional protections attach when a warrant issues do not apply equally when an investigatory subpoena duces tecum is served. Hence, "a subpoena to appear before a Grand Jury is not a `seizure' in the [constitutional] sense, even though that summons may be inconvenient or burdensome."
(citations omitted)
406 N.Y.S.2d at 6, 377 N.E.2d at 451.
The fact that the office records subpoenaed in the case before us were incriminating *71 in the Fifth Amendment sense does not invoke the protection of the Fourth Amendment. In United States v. Bennett, 409 F.2d 888 (2d Cir.1969), the court pointed out that the Fourth Amendment does not protect broadly against the seizure of things whose compulsory production would be forbidden by the Fifth. In United States v. Palmer, 536 F.2d 1278 (9th Cir.1976), the court rejected the argument that the Fourth Amendment was implicated when the defendant's personal property was taken from his attorney by a subpoena duces tecum. Defendant contended that his Fourth Amendment rights were violated because he had a reasonable expectation of privacy in the items subpoenaed. The court declined to explore that question, holding that the use of a properly limited subpoena does not constitute an unreasonable search and seizure under the Fourth Amendment. The court pointed out that although a subpoena results in a compulsory production of private property, it does not involve the type or degree of intrusion found in an ordinary search and seizure; therefore, it does not require probable cause supported by oath or affirmation.
No claim has been made that the subpoenas duces tecum in this case were overbroad or that the evidence sought is not relevant. Neither claim would be successful. Accordingly, we hold that the requirements of the Fourth Amendment were met with regard to the subpoenas duces tecum in this case.
We pause to observe that, in our view, the procedure followed by the state in this case  that is, using subpoenas duces tecum to obtain the evidence it sought in connection with its investigation of Dr. Tsavaris  was much less intrusive than would have been a search pursuant to a search warrant. O'Connor v. Johnson, Minn., 287 N.W.2d 400 (1979).[9] We see no basis for criticizing the state for choosing to use subpoenas duces tecum to obtain the records in question in lieu of seeking the issuance of a search warrant, assuming there was probable cause for such a warrant.
Did the state violate Dr. Tsavaris' privilege against self-incrimination by obtaining his office records from his secretary pursuant to subpoenas duces tecum? We think not; and again, we see no reason to fault the state for proceeding in this manner to obtain relevant evidence.
The United States Supreme Court has made it clear that the Fifth Amendment does not attach to documentary evidence so as to protect it from disclosure in the hands of a person other than the defendant. Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). The Court said in Couch that where incriminatory papers are in the hands of a person other than the accused, there is no reason why a subpoena may not issue for the production of the papers as evidence; such production would require no unreasonable search or seizure, nor would it amount to compelling the accused to testify against himself.
In Couch, the Court made these observations concerning the Fifth Amendment.
It is important to reiterate that the Fifth Amendment privilege is a personal privilege: it adheres basically to the person, not to information that may incriminate him. As Mr. Justice Holmes put it: "A party is privileged from producing the evidence, but not from its production." Johnson v. United States, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913). The Constitution explicitly prohibits compelling an accused to bear witness "against himself": it necessarily does not proscribe incriminating statements elicited from another. Compulsion upon the person asserting it is an important element of the privilege... . It is extortion of information from the accused himself that offends our sense of justice.

*72 In the case before us the ingredient of personal compulsion against an accused is lacking... .
* * * * * *
Petitioner would, in effect, have us read Boyd to mark ownership, not possession, as the bounds of the privilege ... To tie the privilege against self-incrimination to a concept of ownership would be to draw a meaningless line.
409 U.S. at 328-331, 93 S.Ct. at 616-617.
In Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the Supreme Court considered a claim by taxpayers that, because certain documents while in their possession were constitutionally immune from summons, the documents retained that immunity in the hands of the taxpayers' attorney to whom they were delivered. Thus, argued the taxpayers, enforcement of a subpoenas duces tecum requiring the attorney to produce the documents violated the taxpayers' Fifth Amendment rights. In rejecting the taxpayers' argument, the Court said:
The Framers addressed the subject of personal privacy directly in the Fourth Amendment. They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant of search and seizure will issue. They did not seek in still another Amendment  the Fifth  to achieve a general protection of privacy but to deal with a more specific issue of compelled self-incrimination.
We cannot cut the Fifth Amendment completely loose from the moorings of its language, and make it serve as a general protector of privacy  a word not mentioned in its text and a concept directly addressed in the Fourth Amendment. We adhere to the view that the Fifth Amendment protects against "compelled self-incrimination, not [the disclosure of] private information." ...
Insofar as private information not obtained through compelled self-incriminating testimony is legally protected, its protection stems from other sources  the Fourth Amendment's protection against seizures without warrant or probable cause and against subpoenas which suffer from "too much indefiniteness or breadth in the things required to be `particularly described,'"... .
425 U.S. at 400, 96 S.Ct. at 1576.
The Court in Fisher noted parenthetically that the taxpayers and their attorney did not raise arguments of a Fourth Amendment nature and could not have been successful if they had, since the summons were narrowly drawn and sought documents of unquestionable relevance to the tax investigation.
In Tsavaris v. Scruggs, supra, our supreme court held that Dr. Tsavaris was not immunized from prosecution under Section 914.04, Florida Statutes (1979) by reason of the subpoenas duces tecum because he was not asked to say or do anything; in other words, there was no compulsion on Dr. Tsavaris within the meaning of the immunity statute. We hold that there was none for purposes of the Fifth Amendment. In reaching that conclusion, we have given careful consideration to the United States Supreme Court's dictum in Couch v. United States, supra, concerning the matter of constructive possession. A number of courts have speculated on what the Supreme Court meant when it said in Couch that "situations may well arise where constructive possession is so clear or the relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact."
In a case involving facts similar to the circumstances of the case before us, a federal appeals court rejected a constructive possession argument based on the employment relationship between the defendant and the employee on whom a subpoena duces tecum was served. In Matter of Grand Jury Empaneled, 597 F.2d 851 (3d Cir.1979), the court reversed an order quashing a grand jury's subpoena duces tecum. The defendant was a sole proprietor. The person subpoenaed was his office manager. The subpoenaed records were records of the defendant's business maintained by the office *73 manager. The defendant contended that the subpoena duces tecum served on his employee violated the defendant's privilege against self-incrimination under the Fifth Amendment. The court held that the defendant's claim failed on two grounds. First, the subpoena in no way compelled the defendant to testify, to make any declarations, or to produce or identify any documents  the person compelled to produce the documents was the office manager. Second, the subpoena did not force the defendant to make any "testimonial communications."
The court observed that although the subpoenaed records might contain entries made by the defendant, those entries in the records necessarily would have been made prior to service of the subpoena; hence, the subpoena could not have compelled such entries. The court further observed that it is true that a subpoena duces tecum will compel the act of producing the documents, which may itself be deemed a communication having testimonial significance as an admission that the subpoenaed records exist and that they are authentic. But, said the court, it was the office manager rather than the defendant who was required to produce the records and thereby admit their existence and authenticity. The court concluded that whatever "communication" was compelled, it was by the office manager and not by the defendant.
The court specifically considered the argument that, as the office manager's employer, the defendant should be regarded as possessing the records which the office manager prepared and held for him as his employee. The court said that under the analysis adopted by the Supreme Court in Fisher v. United States, supra, the existence of an employment relationship is a relevant consideration only if the subpoena served on the employee will compel the employer to make a "testimonial communication." It pointed out that the office manager testified that she maintained the subpoenaed records and the defendant offered no evidence to the contrary. The court concluded that the office manager was responsible for and had possession of the records. Therefore, no affirmative act by the defendant  no "testimonial communication"  was required in order for the office manager to comply with the subpoena. Equating "private papers" to papers of a personal nature, the court observed that the subpoenaed documents were business records rather than private papers.
We choose to follow the analysis of the court in Matter of Grand Jury Empaneled in our disposition of the case before us. We hold that the issuance and service of subpoenas duces tecum directed to Dr. Tsavaris' secretary and her compliance with those subpoenas did not amount to a compulsion of Dr. Tsavaris within the meaning of the Fifth Amendment. Specifically, we find that Dr. Tsavaris was not in actual or constructive possession of the documents and, in the absence of possession on his part, the Fifth Amendment does not come into play.
Much was said before the trial judge and before this court concerning Dr. Tsavaris' rights of privacy; that is, his expectation of privacy in the office records which were subpoenaed from his secretary. We find no invasion of Dr. Tsavaris' rights of privacy for two reasons. First, where the element of compulsion of the defendant is absent, his rights of privacy are not protected by the Fifth Amendment's proscriptions. We have held that there was no compulsion of Dr. Tsavaris in the case before us because he was not in actual or constructive possession of the subpoenaed office records. Second, the subpoenas complied with the requirements of the Fourth Amendment; there was no search and seizure. Accordingly, there was no violation of rights of privacy protected by the Fourth Amendment.
We are concerned that the names of a number of Dr. Tsavaris' patients appear on the records subpoenaed from his secretary. We have considered whether these patients have constitutionally protected rights of privacy which should be recognized in this case. It has been held that a physician has standing to assert the rights of privacy of his patients insofar as revealing *74 their identities is concerned. Falcon v. Alaska Public Offices Com'n., 570 P.2d 469 (Alaska 1977). As the court noted in that case, there are situations in which, because of a specialized practice, the disclosure of a patient's identity also reveals the nature of the treatment, and the particular type of treatment is one which patients would normally seek to keep private; such examples include the patients of a psychiatrist. The court said that an individual patient has a privacy interest in protecting such sensitive personal information from public disclosure. However, the court's conclusion was based on the Alaska constitution and the right to privacy in Alaska is guaranteed by an explicit constitutional provision; there is none in the Florida constitution.[10]
In a case involving a physician who was not a psychiatrist, the United States Court of Appeal for the Second Circuit rejected the physician's assertion that his patients' rights of privacy under the United States Constitution were violated by a subpoena directed at medical records of patients being treated with certain drugs. The subpoena was issued as part of a professional conduct investigation of the physician. The court observed that the information was crucial to implementation of sound state policy, the investigation of licensed physicians for medical misconduct, and held that the subpoenas did not violate the patients' constitutional rights. Schachter v. Whalen, 581 F.2d 35 (2d Cir.1978). We have found no federal case more closely analogous to the case before us.
Our supreme court has held that an individual's right of disclosural privacy under the Florida constitution is no broader than the right of disclosural privacy under the Constitution of the United States. Shevin v. Byron Harless, 379 So.2d 633 (Fla. 1980). We are, therefore, constrained to follow Schachter and hold that no constitutional rights of disclosural privacy were violated by the disclosure to the state of the identity of patients by reason of its acquisition of Dr. Tsavaris' office records.
The matter does not end there, however. While the disclosure of patients' names to the state has occurred and we have found no violation of constitutional rights by reason of that disclosure, confidentiality must be respected. We remind the state that to the extent the law requires or permits this information to be kept confidential, that confidentiality must be maintained. We are confident that if the state offers evidence at trial disclosing the names of patients, the trial judge will take those steps available to him to preserve confidentiality, including an in camera inquiry to determine relevancy and to determine the extent, if any, to which names of Dr. Tsavaris' patients may be deleted from the state's evidence before its admission.[11]
We reverse the order of the trial judge suppressing the office records obtained by the state from Dr. Tsavaris' secretary. We affirm the trial judge's suppression of the tape recording of the first telephone conversation between Dr. Tsavaris and Dr. Feegel, and reverse the ruling of the trial judge excluding the testimony of Dr. Feegel and Detective Poindexter regarding that telephone conversation. We remand this case for further proceedings not inconsistent with this opinion.
Reversed in part, affirmed in part, and remanded.
BOARDMAN, Acting C.J., and SCHEB, J., concur.
NOTES
[1] Dr. Tsavaris' motion to suppress referred only to the tape recording and the trial judge's written order recites that the motion was granted. However, it is clear from the record that the trial judge intended his order of suppression to cover not only the tape recording but all testimony regarding the conversation.
[2] Section 406.14, Fla. Stat. (1979), provides in part that "[i]t is the duty of the law enforcement officer assigned to and investigating the death to immediately establish and maintain liaison with the medical examiner during the investigation into the cause of death."
[3] The recording device apparently was not connected to the telephone receiver; it was designed to pick up sounds in the room and recorded Dr. Tsavaris' words as they were amplified over the speaker phone. In our view of the case, it is immaterial whether the recording device was actually attached to the telephone receiver.
[4] If an interception is unlawful under Title III, so that the exclusionary provision of Title III is activated, the exclusion applies to state courts as well as federal courts. 18 U.S.C. § 2515.
[5] Unless, as to a person not acting under color of law, the interception is for the purpose of committing a criminal or tortious act or any other injurious act. 18 U.S.C. § 2511(2)(d).
[6] Although the federal and state statutes use "intercept" as a noun, the noun form of the verb "intercept" other than in mathematics is "interception," meaning the act or state of being intercepted or that which is intercepted. To intercept is to take or seize by the way, or before arrival at the destined place; to stop or interrupt the progress or course of. Webster's New International Dictionary (2d Ed. unabridged)
[7] Chapter 934 contains the same provision. § 934.09(7)(a), Fla. Stat. (1979). The words "intercept and record" are also used in subparagraph (2)(g) of § 934.03, which was added to § 934.03 in 1978.
[8] Recognizing the erosion of Boyd in these respects, the supreme court in Tsavaris v. Scruggs, supra, impliedly overruled its decision in the Willard case and disapproved the decision of the First District Court of Appeal in the Dawson case.
[9] California has recently enacted legislation restricting the use of a search pursuant to a search warrant to obtain documentary evidence from a lawyer, physician, clergyman, or psychotherapist not suspected of criminal activity in connection with the evidence. The party having the evidence must first be advised of the specific items sought and be given the opportunity to produce them, as in the subpoena procedure. Pen.Code, § 1524, 1979 Cal. Stats.
[10] We note that a joint resolution has been introduced in the Florida legislature proposing that the Florida constitution be amended by adding Section 23 to Article I reading as follows: "Right of Privacy  Every natural person has the right to be let alone and free from unwarranted governmental intrusion into his private life." HJR 387 Prefiled 1/18/80. The Alaska constitution provides that "the right of the people to privacy is recognized and shall not be infringed." Art. 1, § 22, Alaska Const.
[11] We make no comment concerning the possible application in this case of the statutory psychotherapist-patient evidentiary privilege, which is a separate matter. § 90.242, Fla. Stat. (1975); § 90.503, Fla. Stat. (1979).